UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GEORGE S. LAKNER, M.D.,

*Plaintiff*,

v.

RYAN D. McCARTHY, Secretary of the
Army,

*Defendant*.

Civil Action No. 19-0991 (DLF)

## DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... iii

REGULATORY FRAMEWORK FOR ADVERSE-PRIVILEGING ACTIONS IN THE U.S. ARMY ...................................................................................................................... 1

I.   ABEYANCE ....................................................................................................... 2

II.  INVESTIGATION ............................................................................................. 3

III. PROFESSIONAL PEER REVIEW ................................................................... 3

IV.  HEARING .......................................................................................................... 4

V.   APPEAL ............................................................................................................ 6

STATEMENT OF FACTS ............................................................................................. 7

I.   BACKGROUND. ............................................................................................... 7

II.  PLAINTIFF'S COMPLAINTS AND GRIEVANCES IN KOSOVO ................... 7

III. PLAINTIFF'S ADVERSE-CREDENTIALING ACTION. ................................. 10

IV.  PLAINTIFF'S APPEAL .................................................................................... 16

V.     PLAINTIFF'S ACTIONS FOLLOWING THE FINAL REVOCATION DECISION ........ 17

VI.    THE ABCMR'S FIRST DECISION. ..................................................................... 18

VII.   DASA(RB)'S ACTION ON ABCMR'S FIRST DECISION ................................... 22

VIII.  JUDICIAL PROCEEDINGS AND SUBSEQUENT REMAND TO ABCMR .................. 23

IX.    NEW ABCMR DECISION AND DASA(RB)'S ACTION ..................................... 23

LEGAL STANDARDS ................................................................................................. 24

I.     SUMMARY JUDGMENT STANDARD IN APA CASES ...................................... 24

II.    APA STANDARD OF REVIEW ....................................................................... 25

III.   INCREASED DEFERENCE FOR MILITARY DECISIONS UNDER THE APA ........... 26

ARGUMENT ............................................................................................................. 27

I.     DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE DECISION
       ARTICULATES A RATIONAL CONNECTION BETWEEN THE FACTS FOUND AND
       THE CHOICE MADE, IS SUPPORTED BY THE EVIDENCE IN THE
       ADMINISTRATIVE RECORD, AND IS IN ACCORDANCE WITH LAW ...................... 27

       A.  The Board Explained Its Decision and Provided a Rational Connection Between the Facts
           Found and the Choice Made, and Its Decision Is in Accordance with Law. .................... 27

           1.  Plaintiff Was Not a Victim of Whistleblower Reprisal or Retaliation. .................... 27

           2.  The Credentialing Board Followed Applicable Procedures And Afforded Plaintiff the
               Right to Counsel and Time to Prepare. .................................................................... 28

           3.  No Violation of Article 13, UCMJ, Occurred. ......................................................... 29

           4.  The Command Did Not Withhold Witnesses from Plaintiff ..................................... 30

           5.  COL Meyer's New Affidavit Does Not Change the Substance of His Original Sworn
               Statement ................................................................................................................. 31

       B.  The Board's Finding Is Supported by Substantial Evidence in the Administrative Record
           ................................................................................................................................. 33

           1.  Substantial Evidence Demonstrates Plaintiff Was Not a Victim of Reprisal or
               Retaliation. ............................................................................................................... 33

2.   The Credentialing Board Followed Applicable Procedures.........................................35

3.   Plaintiff's Claims of Witness Tampering Have No Merit.............................................39

II.  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT FAILS .......................................41

CONCLUSION.................................................................................................................................41

## TABLE OF AUTHORITIES

**CASES**                                                                                             **Page**

*Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610 (1986) ........................................................................25

*Bowman Transp., Inc. v. Ark.-Best Freight Syst., Inc.*, 419 U.S. 281 (1974)...................24, 26-28

*Coburn v. McHugh*, 77 F. Supp. 3d 24 (D.D.C. 2014) ...............................................................27

*Dickson v. Sec'y of Defense*, 68 F.3d 1396 (D.C. Cir. 1995)................................................ 25-26

*Epstein v. Geren*, 539 F. Supp. 2d 267 (D.D.C. 2008) ...............................................................27

\* *Escobedo v. Green*, 602 F. Supp. 2d 244 (D.D.C. 2009) ...............................................25-26, 31

*Hensley v. United States*, 292 F.Supp. 3d 399 (D.D.C. 2018) ....................................................26

\* *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085 (D.C. Cir. 1996).....................24, 27-28

*Johnson v. United States*, 628 F.2d 187 (D.C. Cir. 1980) ...........................................................33

*Kreis v. Sec'y of Air Force*, 866 F.2d 1508 (D.C. Cir. 1989).................................................26, 33

*Marsh v. Oregon Natural Res. Council*, 490 U.S. 360 (1989) ....................................................25

*Marshall County Health Care Autho. v. Shalala*, 988 F.2d 1221 (D.C. Cir. 1993) ....................24

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................................................... 25-26

*Occidental Eng'r Co. v. INS*, 753 F.2d 766 (9th Cir. 1985)........................................................24

*Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633 (1990)...............................................25

*Piersall v. Winter*, 435 F.3d 319 (D.C. Cir. 2006) .....................................................................26

*Richard v. INS*, 554 F.2d 1173 (D.C. Cir. 1977) ........................................................................25

*Richardson v. Perales*, 402 U.S. 389 (1971) ............................................................................33

*Sierra Club v. Mainella*, 459 F. Supp. 2d 76 (D.D.C. 2006)................................................. 24-25

**RULES**

Fed. R. Civ. P. 56 ..........................................................................................................1, 24

LCvR 7(h)(2) .................................................................................................................1, 7

## STATUTES

5 U.S.C. § 701 *et seq.* ...............................................................................................23, 25

10 U.S.C. § 813 ................................................................................................................20

10 U.S.C. § 938 .....................................................................................................9, 13, 27

10 U.S.C. § 1552(a)(1) ......................................................................................................26

## OTHER AUTHORITIES

* Army Regulation 40-68, *Clinical Quality Management* (Feb. 26, 2004) ..........................*passim*

Department of Defense Regulation 6025.13-R, *Military Health Systems (MHS) Clinical Quality Assurance (CQA) Regulation* (June 11, 2004) ........................................................................18

_____

* Authority principally relied upon.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| |
|---|
| GEORGE S. LAKNER, M.D., |
| *Plaintiff*, |
| v. |
| RYAN D. McCARTHY, Secretary of the Army, |
| *Defendant*. |

Civil Action No. 19-0991 (DLF)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h)(2), Defendant respectfully submits this memorandum of points and authorities in support of its Cross Motion for Summary Judgment. In support of its motion, Defendant relies upon the Administrative Record ("AR") and the following brief.

Defendant is entitled to summary judgment because the Army Board for Correction of Military Records ("ABMCR" or the "Board") decision provides a rational connection between the facts found and its decision that Plaintiff engaged in unprofessional and unethical conduct, which warranted the Army's revocation of Plaintiff's clinical privileges. The Board's decision was supported by substantial evidence and was in accordance with law. Accordingly, this Court should grant summary judgment in favor of Defendant.

## REGULATORY FRAMEWORK FOR ADVERSE-PRIVILEGING ACTIONS IN THE U.S. ARMY

The Army has established guidelines for adverse-privileging actions taken against medical providers. *See, e.g.*, Army Regulation 40-68, *Clinical Quality Management* (Feb. 26,

2004).  The process has four steps:  investigation, professional peer review, hearing, and appeal.  *Id*. ¶ 10-1.  Action taken by the commander against a provider may be warranted based on conduct deemed not in the best interest of quality patient care.  *Id*. ¶ 10-2.a.  These actions include holding in abeyance and revoking clinical privileges.  *Id*.  Commanders exercise their prerogative when there is reasonable cause to doubt a provider's competence to practice or for any other cause affecting patient safety.  *Id*. ¶ 10-2.b.(7).  It is considered appropriate to revoke privileges when there is evidence of unprofessional or unethical conduct.  *Id*. ¶¶ 10-3.a., 10-4.b.

Timelines are established to allow the provider "adequate time to prepare and sufficiently participate in the proceedings" and to "facilitate timely resolution" of the adverse-privileging action.  *Id*. ¶ 10-5.d.  "While it is important that the time limits . . . are met, no rights will accrue to the benefit of an affected provider, in an otherwise proper action, based solely on the organization's failure to meet such time limits."  *Id.* ¶ 10-5.d.

## I.  ABEYANCE.

When a provider's conduct requires action to protect the health or safety of patients, his clinical privileges are placed in abeyance while a thorough and impartial investigation is conducted.  *Id*. ¶10-6.  This fact-finding period allows time to "gather and carefully evaluate additional information" regarding the situation prior to initiation of an adverse-privileging action.  *Id*.  Importantly, an abeyance is "not an adverse privileging action."  *Id*. ¶ 10-6.a.(1).  However, the provider is formally placed "on notice" that "scrutiny of his practice has begun" which may result in such an action.  *Id*.  Abeyance action is taken when an evaluation of performance appears warranted but information is insufficient to suspend privileges or the potential hazard to patient care is "not well defined."  *Id*. ¶ 10-6.a.(2).  During abeyance, the provider is assigned to

nonclinical duties until the investigation is complete. *Id.* The provider is notified in writing that his privileges have been placed in abeyance. *Id.* ¶ 10-6.c.(1)(a).

## II. INVESTIGATION.

Following abeyance action, there is an "immediate and rigorous" investigation to collect "the relevant facts and information." *Id.* ¶ 10-6.d.(1). The commander appoints an officer to conduct the investigation and reports the results to a credentials committee. *Id.* The investigation may include voluntary consultation with the provider, review of any relevant documents, and discussion with other individuals having knowledge of the situation. *Id.* ¶ 10-6.(d)(2). When the investigation is complete, a report is submitted by the investigating officer, who "presents the factual findings with appropriate justification or details" and may include conclusions and recommendations. *Id.* ¶ 10-6.(d)(2)(a).

## III. PROFESSIONAL PEER REVIEW.

At the conclusion of the investigation, the credentials committee reviews and "carefully consider[s]" the investigating officer's report, which serves as the basis of a "peer review" that may be warranted for an adverse-privileging action against the provider. *Id.* ¶ 10-6.e. After reviewing the report, the credentials committee chairperson may recommend to the commander that a peer-review panel be convened to evaluate available information and determine if the standard of care was met. *Id.* ¶ 10-6.e.(2)(c). If so, the peer review is conducted to evaluate the provider's conduct to determine "the extent of the problem" and make recommendations through the credentials committee to the commander. *Id.* ¶ 10-6.f.(1). The provider "does not have the right to be present during the proceedings" but does have the opportunity to provide a written statement, appear before the committee and make a verbal statement, clarify issues in the case as needed, ask questions, and respond to questions from the committee. *Id.* ¶ 10-6.f.(1)(c). The

provider is "encouraged" to consult with legal counsel at any step in the adverse privileging action, but the peer review "is not a legal proceeding." *Id*. ¶ 10-6.f.(1)(d).

The provider acknowledges receipt of the peer-review notification, which sets forth the date, time, and location of the peer review, a statement of alleged facts, and the provider's rights regarding participation in the proceedings. *Id*. ¶¶ 10-6.f.(2)(a)-(c). The peer-review process is a function of the provider's peers, not the command. *Id*. ¶ 10-6.f.(4). To ensure impartiality, specific rules apply to "voting participants" in the peer review, as opposed to non-voting participants, such as the credentials manager. *Id*. ¶¶ 10-6.f.(3)(c), (4)(a)-(h). The peer review considers information from the investigation and any other relevant facts, and makes a recommendation to the credentials committee regarding the provider's clinical privileges. *Id*. ¶ 10-6.f.(5). This includes the revocation of clinical privileges. *Id*. ¶¶ 10-6.f.(5)(a)-(e). The commander reviews and decides what privileging action to take based on the facts provided but is "not bound" by the recommendations. *Id*. ¶ 10-6.f.(7)(a).

## IV.  HEARING.

If the proposed action is to revoke the provider's privileges, the commander must advise the provider in writing of his hearing and appeal rights. *Id*. ¶10-6.f.(7)(c). The written notice specifies the deficiencies substantiated by the peer-review process, the proposed adverse-privileging action to be taken by the commander, and the right of the provider to request and be present at a formal hearing. *Id*. ¶ 10-7.a.(1). If the provider wishes to request a hearing, he must do so in writing. *Id*. ¶ 10-7.b. Prior to the hearing, the provider will have access to all information that will be presented for consideration at the hearing. *Id*. ¶ 10-7.b.(1). The hearing is administrative in nature, and therefore, "the rules of evidence prescribed for trials by courts-martial or for proceedings in a court of law are not applicable." *Id*. ¶ 10-8.a.(1). The hearing

4

"should convene within [ten] duty days (not less than [five] days but not more than [ten] days)" from the provider's receipt of the hearing notification, unless extended "for good cause" by the hearing board chairperson. *Id.* ¶ 10-8.b.(2).

The provider is notified of the names of witnesses who will be called to testify at the hearing, his right to be present, submit evidence, question witnesses, and call witnesses on his behalf. *Id.* ¶¶ 10-8.b.(3)-(4). The provider is advised that "he is responsible for arranging the presence of his witnesses," and that "failure of such witnesses to appear will not constitute a procedural error or basis for delay" of the proceedings. *Id.* ¶ 10-8.b.(4). The provider has the right to "consult" legal counsel; however, legal representation "is not an entitlement" and may be provided "subject to resource limitations" as determined by the supervisory judge advocate of the staff judge advocate or trial defense service. *Id.* ¶ 10-8.b.(5). The provider's legal counsel may attend and advise the provider during the hearing and, subject to the discretion of the hearing committee chairperson, be permitted to explain the provider's position in the matter. *Id.* ¶ 10-8.c. However, counsel is not permitted to ask questions, respond to questions on behalf of the provider, call or question witnesses, or enter material into the record. *Id.* The hearing board may obtain advice concerning legal questions from the servicing legal advisor. *Id.* ¶ 10-8.k.

The hearing board reviews all material presented, including that submitted by the provider. *Id.* ¶ 10-8.e. Similar to the peer review, voting members of the hearing board are separate from non-voting members, and voting members may not be individuals who were involved in the earlier peer review. *Id.* ¶ 10-8.a. The chairperson arranges for the orderly presentation of information and rules on any objections made by the provider. *Id.* A verbatim transcript of the proceedings is made. *Id.* ¶ 10-8.e.(3). Following the presentation of all evidence and relevant information, the provider is excused, and the hearing board determines the

findings and recommendations to be made to the commander.  *Id.* ¶ 10-8.f.[1]  Recommendations

may include, but are not limited to, revocation of clinical privileges.  *Id.* ¶ 10-8.f.(1)-(5).  The

hearing record is forwarded to the provider and the commander.  *Id.* ¶ 10-9.a.  The provider is

given ten duty days to submit a written statement of corrections, additions, and other matters he

wishes to present to the commander.  *Id.*  The servicing legal advisor reviews the record for legal

sufficiency prior to action by the commander, who then reviews it and makes a decision

regarding the provider's clinical privileges.  *Id.* ¶¶ 10-9.b.-c.

## V.  APPEAL.

When the commander decides to revoke clinical privileges, the provider is granted the

right to appeal the decision by submitting a formal request that identifies the errors of fact or

procedures that form the basis of his request.  *Id.* ¶ 10-10.a.(2).  The burden is on the provider to

specify the grounds for appeal.  *Id.*  The commander is granted fourteen calendar days to

consider the request.  *Id.* ¶ 10-10.b.  If the commander denies the request, the action is

automatically endorsed as an appeal to the Army Surgeon General—who is the final appellate

authority for revoking clinical privileges.  *Id.*  In such cases, the U.S. Army Medical Command

("MEDCOM") convenes an "appeals board" consisting of three privileged providers, chaired by

an officer appointed by the Army Surgeon General.  *Id.* ¶ 10-10.d.-e.  The appeals board reviews

all information furnished by the provider, as well as the hearing record, and all findings and

recommendations, "in light of the provider's alleged basis for appeal."  *Id.* ¶ 10-10.f.  After

considering the information and evaluating the merit of the provider's appeal, the appeals board

---

[1]  Each of the committee's findings must be supported by a preponderance of the evidence,
meaning each finding "must be supported by a greater weight of evidence than supports a
contrary conclusion, that is, evidence which, considering all evidence presented, points to a
particular conclusion as being more credible and probable than any other conclusion."  *Id.* ¶ 10-
8.f.*Note*.

forwards its findings and recommendations to MEDCOM for review and approval by the Army

Surgeon General. *Id*. The Army Surgeon General then notifies the provider of her decision. *Id*.

¶ 10-10.g. If the decision is to uphold a revocation of clinical privileges, the Army Surgeon

General is required to report the provider's adverse-privileging action to the National Practitioner

Data Bank ("NPDB").[2] Id. ¶¶ 14-3, 14-3.b.(1)(a).

### STATEMENT OF FACTS[3]

## I. BACKGROUND.

Plaintiff served in the U.S. Army reserves from March 1981 until his retirement in the

rank of colonel (O-6) in April 2006. AR 267-68, 420-21. Plaintiff was a psychiatrist, with a

secondary area of concentration as a preventative medicine officer. AR 421. In July 2004,

Plaintiff was ordered to active duty in support of Operation Allied Force/Joint Guardian

Yugoslav/Kosovo Force and later deployed to Camp Bondsteel, Kosovo. AR 321-24.

## II. PLAINTIFF'S COMPLAINTS AND GRIEVANCES IN KOSOVO.

Shortly after arriving to Kosovo, Plaintiff had disagreements with his command, which

led to several complaints and grievances. Among other things, Plaintiff mistakenly believed that

he replaced Lieutenant Colonel ("LTC") Robert Roggenbach as the officer in charge ("OIC") of

the unit's combat stress control program ("CSCP"). AR 713-14. Plaintiff found out otherwise

on August 28, 2004, when LTC Roggenbach held a meeting informing the CSCP team, including

---

[2]     The National Practitioner Data Bank (NPDB) is "[t]he agency designated by the
Department of Health and Human Services to receive and provide data on substandard clinical
performance of physicians, dentists, and other licensed health care practitioners, including data
on malpractice claims payment made on behalf of those practitioners." *Id*., Glossary, at 164.

[3]     In compliance with Local Civil Rule 7(h)(2), Defendant submits this Statement of Facts
with references to the AR.

Plaintiff, of their duties.  *Id.*  Plaintiff was directed to report directly to LTC Roggenbach and refrain from attending meetings designated for the OIC.[4]  AR 714.  According to Plaintiff, Colonel ("COL") Stanley Flemming, his immediate commander, admonished him via email for requesting a follow-up appointment with Brigadier General ("BG") Tod Carmony, the unit's commanding general.  *Id.*  Plaintiff also claimed that COL Flemming "orally admonished and humiliated" him in front of his colleagues for breaching the chain of command.  *Id.*  Nevertheless, on September 8, 2004, Plaintiff received a memorandum from LTC Roggenbach, instructing him to schedule an appointment with BG Carmony.  AR 711.

After meeting with BG Carmony, Plaintiff followed up and provided him with a memorandum discussing the unit's CSCP as well as his personal grievances with COL Flemming.  AR 713-14.  Plaintiff claimed that his concerns were not an issue of a personality conflict with COL Flemming but acknowledged that one may exist.  AR 713.  Plaintiff expressed his opinion that the CSCP should be a separate facility from the main hospital and that he should be the CSCP OIC, not LTC Roggenbach.  AR 713-14.  Plaintiff expressed his discontent with the decision to "restructure" the chain of command, believing he should be in charge given his rank, experience, and training—rather than having to take orders from an OIC junior in rank to him.  AR 714.  Plaintiff requested BG Carmony's support to "receive the professional respect" he believed he deserved, in line with his vision of the mission.  *Id.*

---

[4]     Plaintiff was apparently counseled in writing by LTC Roggenbach; however, that "counseling" was later revoked by mutual agreement among Plaintiff, his immediate commander, and a local inspector general.  AR 721.

Not getting the response he wanted, Plaintiff filed a complaint under Article 138,

Uniform Code of Military Justice ("UCMJ")[5], through BG Carmony to Major General ("MG")

Bennie Williams, the commanding general of the 21st Theatre Support Command, located in

Kaiserslautern, Germany.  AR 723-25.  Plaintiff alleged that he was "wronged" by COL

Flemming and that he made an informal complaint to BG Carmony but received no response.

AR 723.  According to Plaintiff, he followed-up with a formal complaint to COL Flemming and

BG Carmony on October 1, 2004, but both officers subsequently denied his requested relief.  *Id*.

In his Article 138 complaint, Plaintiff reasserted many of his previous grievances.

Specifically, Plaintiff alleged that he was constructively relieved of his duties as the CSCP OIC

in place of a junior officer and that his psychiatry duties were limited or restricted.[6]  AR 723-24.

He also complained that COL Flemming disapproved his extension request to stay on active

duty.  AR 723.  Plaintiff further alleged that he filed an Inspector General ("IG") complaint

against COL Flemming and that he was being retaliated against because of it.  AR 723-24.

Along with his complaint, Plaintiff submitted several letters as "evidence of [his]

professionalism, proficiency and dedication to [his] mission."  AR 724.  One of those letters was

from a colleague, COL David Meyer, and another was from a subordinate enlisted soldier,

Sergeant ("SGT") Gary Wright.  AR 372, 393.

---

[5]     Under Article 138, UCMJ, "Any member of the armed forces who believes himself
wronged by his commanding officer, and who, upon due application to that commanding officer,
is refused redress, may complain to any superior commissioned officer, who shall forward the
complaint to the officer exercising general court-martial jurisdiction over the officer against
whom it is made."  10 U.S.C. § 938.

[6]     In response to Plaintiff's initial Article 138 complaint, COL Flemming informed Plaintiff
that he was never appointed as the CSCP OIC by any officer exercising appropriate authority.
AR 726-29.

The command suspected that Plaintiff manipulated the letters without the authors' approval and, as a result, initiated an investigation, which eventually led to an adverse-privileging action against Plaintiff.  The command discovered the matter when COL Meyer and SGT Wright approached them, complaining about Plaintiff pressuring them to provide the altered letters.  AR 394.  Evidence surfaced that Plaintiff altered the letter written by COL Meyer and placed it on official letterhead without COL Meyer's approval.  Plaintiff also pressured his subordinate SGT Wright to write a letter, altering the content after SGT Wright drafted it.  AR 394, 648, 733.

## III.  PLAINTIFF'S ADVERSE-CREDENTIALING ACTION.

On November 8, 2004, a medical credentials committee convened a special meeting to determine if adverse-privileging actions should be taken against Plaintiff for fraud, unprofessional conduct, and unethical misconduct.  AR 371.  The committee determined that there was insufficient information to warrant an adverse-privileging action at that time but voted to place Plaintiff's privileges in abeyance for fifteen days pending further investigation.  AR 372.

Thereafter, COL Meyer completed a sworn statement as part of the investigation.  AR 733-34.  He was sent a copy of the letter submitted by Plaintiff as part of his Article 138 complaint.  After reviewing the letter, COL Meyer confirmed that his original letter was altered by Plaintiff.  AR 733.  In addition, COL Meyer stated that Plaintiff asked him to write the original letter under the false pretenses of needing the letter to obtain civilian employment since he was leaving Kosovo sooner than he had planned.  *Id.*  COL Meyer stated:

> The first page of the letter is not the letter I wrote.  The second page is part of the letter I signed.  Specifically, I did not use an official letterhead and did not write the letter as a Memorandum for Record.  I did not write that I was the Chief of the Medical Staff . . . The term Task Force (Brigade) Psychiatrist was not written in that way in my original letter . . . I do not remember writing the first clause of the last sentence of the second paragraph . . .

> Unfortunately, I did not ask for a copy of the original letter of the letter I signed, therefore there may be more inconsistencies I have not addressed.  I would state categorically, [Plaintiff] altered the original letter I wrote for him and that he placed it on official letterhead paper, an action I would never have condoned. Also, since the letter was to help him seek civilian employment, I had no intention that it would be used concerning his present military assignment.

*Id.*

SGT Wright also reviewed the letter Plaintiff submitted on his behalf.  SGT Wright highlighted certain portions of the letter and wrote that "[t]he information that is highlighted in this letter is not true and was not written by me."  AR 393.  SGT Wright also completed a sworn statement memorializing additional facts.[7]  AR 394.  According to SGT Wright, he had "not known [Plaintiff] for about two decades," he had "never worked for the New York City Department of Mental Health," or "the Rikers Island Hospital," and he had "no knowledge of [Plaintiff's] work outside of the military," all assertions that appeared in the letter submitted by Plaintiff.  *Id.*  Furthermore, SGT Wright expressed that Plaintiff was writing the letter "for himself," and that he "was uncomfortable with the situation."  *Id.*

On November 11, 2004, COL Flemming informed Plaintiff that his practicing privileges were placed in abeyance pending further investigation.  AR 654, 736.  Days later, COL Flemming provided Plaintiff with written notification of the abeyance decision.  AR 654.

Between November 19 and 21, 2004, COL Jesse Cavenar conducted an "in depth" investigation and generated a memorandum entitled "External Peer Review on [Plaintiff]."  AR 794.  COL Cavenar met with Plaintiff and provided him with a "detailed list of charting problems."  *Id.*  COL Cavenar later returned and allowed Plaintiff the opportunity to respond to

---

[7]     None of SGT Wright's statements were provided by Plaintiff to the ABCMR.  Instead, only selective portions were reflected in a document drafted by an individual whom Plaintiff later hired to discredit COL Meyer and SGT Wright.  AR 393-97.

the "detailed allegations." [8]  *Id.*  At the end of November, Plaintiff was transferred to Germany to

undergo a mental-health evaluation based on growing concerns.[9]  AR 777, 789-90, 796.  Plaintiff

was mentally sound but diagnosed with "narcissistic personality disorder."  AR 790.  The

treating provider further found that Plaintiff met the criteria of "exploitation and lack of . . .

empathy."  AR 797.[10]  Following his evaluation, around December 7, 2004, Plaintiff was served

with notice to appear at an upcoming peer-review hearing, which he later attended on December

14, 2004.  AR 790, 794-95, 798, 803.

On January 5, 2005, Plaintiff was informed that a credentialing committee hearing would

be held in Landstuhl, Germany, to review his provider-credentialing privileges.  AR 815.  On

January 11, 2005, the legal advisor for the Europe Regional Medical Command, Captain

("CPT") Michael Meketen, sent an email to Plaintiff's military attorney, CPT Mary Ritzmann,

confirming that Plaintiff's hearing would occur on January 18, 2005, as scheduled.  AR 754.  He

also confirmed that Plaintiff had already received, or would receive, any and all documentation

the hearing officers would consider—in compliance with the applicable Army regulation.  *Id.*

---

[8]     Plaintiff later claimed that he was not afforded enough time to respond, and that COL
Cavenar's report focused almost exclusively on the allegations of charting problems, with no
mention of Plaintiff's fraudulent letters.  AR 794.  Plaintiff did not provide COL Cavenar's
report as part of the record.  Plaintiff did acknowledge, however, that he had time to prepare a
"detailed rebuttal" before appearing at his peer-review hearing, although he alleges—without
supporting evidence—that he was not allowed to submit it.  AR 794.

[9]     Plaintiff claimed that while in Germany from November 24, 2004, through December 17,
2004, during the mental-health evaluation period, he was held in conditions tantamount to
confinement with military-police escorts.  AR 776.  Thereafter, from December 17, 2004,
through January 20, 2005, Plaintiff claimed to be held in restrictive conditions that were
"excessive," although the command removed the military-police escorts, provided a hotel room
to him, and only required him to check in with his leadership once a day.  AR 778.

[10]    Plaintiff later hired a German medical provider to rebut the claim of narcissistic
personality disorder.  AR 797.

Citing specific provisions of the regulation, CPT Meketen advised CPT Ritzmann of the limitations of her participation during the hearing.  *Id*.  He reminded CPT Ritzmann that the regulation did not afford an absolute entitlement to representation by counsel, but nevertheless, if she was unable to attend in person, he would attempt to accommodate a request by Plaintiff to arrange for her appearance virtually or telephonically.  *Id*.  Lastly, as to witnesses, CPT Meketen advised CPT Ritzmann that it was Plaintiff's obligation to ensure any witnesses he intended to call were available for the hearing, and that their failure to appear, telephonically or otherwise, would not constitute cause to delay the proceedings.  *Id*.

Prior to the hearing, Plaintiff twice travelled to Schweinfurt, Germany, to consult with CPT Ritzmann.  AR 756.  In addition, CPT Ritzmann spent an "inordinate amount of time on [Plaintiff's] case."  AR 757.  According to CPT Ritzman, she "represented [Plaintiff] for a mental health evaluation, assisted him on a [General Officer Memorandum of Reprimand], advised him on the peer review panel, reviewing a huge number of documents relating to an open case in [California] as well as his Article 138 complaint and IG complaint."  *Id*.  CPT Ritzmann requested discovery material beyond what she was already provided, appealed a denial of her earlier request to reschedule the hearing, and opposed moving forward with the board as scheduled.  AR 759-62.  She sent a copy of her correspondence to the credentialing committee for its consideration.   AR 761.

On January 18, 2005, the credentialing committee met and conducted the hearing. Plaintiff was present in person, along with CPT Ritzmann.  AR 647.  The hearing lasted eight hours. AR 691.  The committee was comprised of eight voting members.  AR 647.  Several non-voting members were also present, including the credentials program manager, Maureen Davis. *Id*.  The committee reviewed the packet of information concerning the question of Plaintiff's

integrity and clinical competence.  *Id.*  It heard testimony from Plaintiff and his two witnesses, and reviewed over fifty documents Plaintiff provided.  *Id.*  Portions of the verbatim transcript from the hearing show that Plaintiff was questioned extensively by the committee regarding the relevant issues, allowed to consult with counsel, and permitted to provide responses on his own behalf.[11]  AR 765-74.  Plaintiff was afforded the opportunity to provide the committee "evidence that the Kosovo command bypassed due process[,] . . . stripped him of his authority, detained him[,] and then shipped him under guard to Germany without stating its reasons for doing so."  AR 683.  Plaintiff also had the chance to present to the committee his arguments about due process, the witnesses who authored the letters in question, and other so-called "evidence" for its consideration.  *Id.*

The committee considered the evidence and detailed its findings.  AR 647-48. First, as to Plaintiff's competence and missing documentation of his clinical care while serving in Kosovo, the committee determined that Plaintiff's clinical performance failed to meet the required standard of care.  AR 648.  Second, as to Plaintiff's ethical conduct, the committee found:

> The sworn statements by individuals stating that [Plaintiff] had either re-written documents or coerced a subordinate to sign a letter of recommendation were not explained to the Committee in a satisfactory manner by [Plaintiff].  The evidence pointed toward a practice of influencing others to write letters of recommendation and/or writing them himself to provide a false impression.  This behavior was found to be of grave concern and calls into question his integrity as a healthcare provider and thus is a significant concern to this organization.

*Id.*

---

[11]     Plaintiff did not provide the full transcript to the Board for consideration.  AR 614, ¶ 11.k. (referring to AR 765-74).  Plaintiff submitted only eleven pages of the transcript, from various stages of the proceedings (i.e., pages 2, 21, 27, 64-65, 71-72, 81, 97, and 110-11).  The discussion on the final page does not appear to be the end of the proceedings.  AR 64-74.

Finally, as to Plaintiff's California licensure, the committee found irregularities, but

Plaintiff's other behavior "made the ongoing question of licensure a moot point." *Id.* Based on

the evidence, the committee voted by secret ballot and unanimously recommended to revoke

Plaintiff's clinical privileges. *Id.*

Following the hearing, Plaintiff was transferred back to Fort Benning, Georgia, then to

Walter Reed Army Medical Center in Washington, D.C., for treatment of preexisting medical

conditions. AR 219, 661. Based on his version of the events that occurred in Kosovo, Plaintiff

was ordered to undergo another mental-health assessment. AR 219. The treating medical

provider determined that Plaintiff did not suffer from delusions or dementia but diagnosed him

with "narcissistic personality traits." AR 401. Upon further analysis, including additional

consultation and review of underlying documents, the treating provider updated his diagnosis to

"personality disorder, [not otherwise specified] with narcissistic and passive aggressive traits."

AR 402-03. Nevertheless, the provider found Plaintiff fit for duty.[12] AR 402.

On August 25, 2005, Plaintiff submitted a lengthy rebuttal to the credentialing

committee's recommendation. AR 781-817. The commander of the United States Army Europe

Regional Medical Command, BG Carla Hawley-Bowland, took action on the recommendation.[13]

---

[12]    Plaintiff filed an IG complaint regarding his mental-health evaluation under allegations of
whistleblower reprisal. AR 406-12. The Department of Defense ("DOD") IG investigated the
allegations and found that Plaintiff's commander "followed the appropriate [DOD] procedural
requirements in making the [mental health evaluation] referral." AR 481. The DOD IG also
searched for other whistleblower reprisal records in its system. AR 638. While it found two
cases created in 2006 and 2008, both were closed with no investigation—likely based on lack of
merit. *Id.* Plaintiff submitted an email that appears to be from an IG employee in 2004, but it
was related to a matter from Plaintiff's prior assignment. AR 652.

[13]    BG Hawley-Bowland explained that the original commander who was supposed to take
action on the case, COL Steven Francis, sat as a member of the credentialing committee, and was
therefore conflicted from taking action on the committee's recommendation. A new commander
succeeded him; however, in the interest of continuity and due diligence, since the case was

AR 417-18.  After careful review of the record and Plaintiff's post-hearing submissions, BG Hawley-Bowland accepted the committee's recommendation to revoke Plaintiff's clinical privileges and notified Plaintiff of her decision, along with his appellate rights.[14]  *Id.*

Plaintiff was released from active duty on March 21, 2006, and retired from the Army reserve component on April 1, 2006.  AR 420-21.

## IV.  PLAINTIFF'S APPEAL.

Plaintiff appealed his revocation to the Army Surgeon General.  AR 423.  On May 2, 2006, MEDCOM convened an appeals board to consider Plaintiff's appeal.  AR 424-26.  The appeals board noted that BG Hawley-Bowland partially granted Plaintiff's request by dismissing the first issue on appeal.  AR 425.  The appeals board reviewed and enclosed all relevant documents.  AR 426.

The board engaged in a point-by-point discussion, noting Plaintiff's misrepresentation to the letters' authors that the letters were to be used for Plaintiff's search for civilian employment. AR 425.  The board agreed that (1) it was unprofessional conduct to falsify documents; (2) Plaintiff's coercion used to obtain the signatures was unethical; and (3) Plaintiff's explanation regarding the falsification was not acceptable.  *Id.*  The board further noted that Plaintiff's responses in his rebuttal were discredited.  *Id.*  In providing further analysis, one member stated:

> It shows a severe lack of judgment to use falsified records.  My biggest concern for the type of behavior exhibited is that it spills over into every area including patient care.  There is a definite link between unprofessional conduct and patient care because if you can't trust what is in his own records, then how can you trust what he puts in patient records.

---

ongoing for some time, BG Hawley-Bowland removed it to her level upon consultation with her servicing legal advisor.  AR 417.

[14]     BG Hawley-Bowland partially granted Plaintiff's request and dismissed the first issue on appeal due to the absence of medical records but affirmed the second issue related to the letters submitted by Plaintiff as part of his Article 138 complaint.  AR 425.

AR 425-26.

The appeals committee upheld the adverse-privileging action against Plaintiff.  AR 426.

After careful consideration of the entire record to include matters raised in Plaintiff's appeal, the

Army Surgeon General determined that Plaintiff's revocation action was proper.[15]  AR 423.  On

May 19, 2006, Plaintiff's revocation of clinical privileges was reported to the NPDB.  AR 428-

30.

## V.  PLAINTIFF'S ACTIONS FOLLOWING THE FINAL REVOCATION DECISION.

On November 28, 2012, COL Kimberly Kesling, MEDCOM Quality Management

Division, wrote a letter to Plaintiff in response to his request to remove the adverse-credentialing

action from the NPDB.  AR 447.  In her letter, COL Kesling summarized her understanding of

the basis for the revocation.  AR 463.  Her authority and action was not part of a formal appeal—

as Plaintiff's appellate process was complete—but rather to review the records to determine if

Plaintiff had new information (which he did not) that might warrant further review.  AR 447.

Following that, Plaintiff's attorney sought out and contacted COL Meyer.  AR 444.  On

October 13, 2013, COL Meyer signed an affidavit addressing one line of COL Kesling's letter.

AR 837.  That line states, "COL Meyer's reports that you wrote a letter for him to sign, he

extensively edited it and the final product was not the letter that he approved."  *Id*.  In response

to that statement, COL Meyer wrote in his affidavit that "[t]his statement . . . is misleading.  The

letter was written on a word processor by me with input from [Plaintiff].  The contents of the

letter pertaining to [Plaintiff] were not edited or altered after I had signed it."  *Id*.  No further

context was provided, and COL Meyer's affidavit did not address the content of his sworn

---

[15]     Under Army Regulation 40-68, ¶ 14-3, that decision was final and would be reported to the NPDB, the Federation of State Medical Boards, and known states of licensure.

statement from November 10, 2004.  *Id.*  Plaintiff later sought to have the adverse-credentialing action removed from the NPDB, which was denied.  AR 450-52.

## VI.  THE ABCMR'S FIRST DECISION.

On November 3, 2015, Plaintiff applied to the ABCMR, requesting to reverse the decision to revoke his clinical privileges.  AR 235.  The MEDCOM Office of the Staff Judge Advocate ("OSJA") provided an advisory opinion to the Board, addressing Plaintiff's claims.  AR 170-74.  The OSJA reviewed Plaintiff's application, arguments, and attachments.  AR 170.  It also thoroughly reviewed the underlying quality-management process by which Plaintiff's clinical privileges were revoked[16] in the context of controlling regulations.[17]  *Id.*  The OSJA concluded that the records complied with existing regulations, and therefore, recommended denial of Plaintiff's relief.  *Id.*

First, the MEDCOM OSJA found that COL Meyer's affidavit did not render the revocation decision erroneous and unjust, stating:

> In support of this assertion [Plaintiff] submitted an affidavit by COL(R) David Meyer dated 21 October 2013.  This assertion is not accurate, as the evidence does not render the revocation decision erroneous or unjust.  The affidavit to which [Plaintiff] refers was previously reviewed by MEDCOM in December 2013.  At that time it was determined that the affidavit does not negate all bases upon which the Surgeon General (TSG) made the decision to report [Plaintiff's]

---

[16]     The OSJA explained that the information contained in its advisory opinion was compiled from quality-assurance documents prepared under the protection of 10 U.S.C. § 1102 and is not to be disclosed to the public.  While quality-assurance information is authorized for release to the ABCMR for its use and consideration pursuant to Army Regulation 40-68, Appendix B, paragraphs B-6(b) and (e), the records of quality assurance activity or process remain confidential and further disclosure may be made only as specifically provided by law.  AR 173.  While the MEDCOM OSJA had access to all underlying quality assurance documents in this case, the ABCMR had only those quality-assurance documents selectively provided by Plaintiff.  AR 160-61; *see supra* FN 2.

[17]     Specifically, the OSJA analyzed Plaintiff's claims under Department of Defense Regulation 6025.13-R, *Military Health Systems (MHS) Clinical Quality Assurance (CQA) Regulation* (June 11, 2004), and Army Regulation 40-68.

privilege revocation to the National Practitioner Data Bank (NPDB), nor does it contradict all of Dr. Meyer's original sworn statement. The affidavit does not render the revocation decision erroneous or unjust, as there is independent, still unrefuted evidence upon which the revocation decision was based.

AR 170.

Second, the OSJA addressed Plaintiff's argument that the decision to revoke his privileges was contrary to law because it was not based on the quality of his patient care:

> This is a misstatement of the regulatory requirement, which allows for adverse privileging action for 'any other cause affecting the safety of patients or others' which expressly includes 'significant unprofessional conduct.' The regulation goes on to explain that this includes unprofessional and unethical conduct. [Army Reg.] 40-68 para. 10-2b and 10-4b. The recommendation of the Appeal Board, the determination by the TSG, and the NPDB reporting language refer to [Plaintiff's] privileges being revoked for significant unprofessional conduct resulting from him falsifying a letter from a peer physician, coercing an enlisted Soldier medic to write a letter, and then using the documents in an official Government complaint. This conduct satisfies the regulatory requirement for a report. Additionally, [Plaintiff] received a General Officer Memorandum of Reprimand for this unprofessional conduct, which provides an independent basis for the report under [Army Reg.] 40-68 para. 10-15a and Appendix li.

AR 171.

Third, the OSJA addressed Plaintiff's argument regarding his due-process rights:

> This assertion is without merit. [Plaintiff's] due process rights were met throughout the QM [quality management] review process, which complied substantially with the requirements of [Army Reg.] 40-68. All required notices were provided to [Plaintiff], he had assistance of counsel, and he was given the opportunity to appear, present evidence, and answer questions at the scheduled Peer Review and Credentials Hearing Board. The QM process was properly conducted at the Landstuhl Regional Medical Center, and the Europe Regional Medical Commander was an appropriate authority to revoke [Plaintiff's] privileges. Additionally, the case was subjected to thorough legal review prior to TSG making a final reporting determination.

*Id.*

Fourth, the OSJA addressed Plaintiff's argument that the decision violated Article 13 (10 U.S.C. § 813), UCMJ:

This assertion is without legal basis.  Article 13 of the Uniform Code of Military Justice is a provision that prohibits punishment before trial.  The provision specifically states, "No person, while being held for trial . . ."  There is no evidence that [Plaintiff] was held for trial or that he was punished before a trial.  Furthermore, this assertion by [Plaintiff] is not relevant to the QM process that resulted in revocation of his privileges, as the QM process is separate and distinct from any military justice process.

*Id.*

Fifth, the OSJA addressed Plaintiff's argument that the decision to revoke his privileges

was an unconstitutional taking:

The 5th Amendment to the U.S. Constitution provides that no person shall be deprived of property *without due process of law* [emphasis added].  As discussed . . . above, [Plaintiff] was afforded due process throughout the QM process that complied substantially with the regulatory requirements.  All required notices were provided to [Plaintiff], he had assistance of counsel, and he was given the opportunity to appear, present evidence, and answer questions at the scheduled Peer Review and Credentials Hearing Board.  [Plaintiff's] claim that he was deprived of his property interest without due process is without merit.

*Id.*

Sixth, the OSJA addressed Plaintiff's argument that the decision to revoke his privileges

was arbitrary, capricious, and an abuse of discretion:

This assertion is without merit for several reasons.  The QM process by which the [Plaintiff's] privileges were revoked involved multiple levels of review by objective medical professionals who were not members of the leadership.  The process complied with the regulatory requirements, which involved comprehensive review of all the evidence and panel votes at multiple junctures. [Plaintiff's] due process rights were met, as he was given requisite notice and the opportunity to participate in the process.  There is specific evidence that the Hearing Board decision was reached by a properly comprised panel who considered the complete record, including evidence submitted by [Plaintiff].  It is clear that after careful review and deliberation, the Hearing Board found sufficient evidence and supportable grounds for the recommended revocation of the [Plaintiff's] privileges.

AR 172.

In addressing the remaining issues raised by Plaintiff, the OSJA explained that the NPDB

"functions as a repository for information 'relating to the professional competence and conduct of physicians, dentists and other health care practitioners,'" and that the statute is implemented within the DOD and Army by regulations that require the Army Surgeon General to report adverse-privileging actions against a provider. AR 172. Elaborating further, the OSJA stated:

> A Military Treatment Facility (MTF) commander takes action against a provider's privileges based on performance suspected or deemed not to be in the best interest of quality patient care. [Army Reg.] 40-68, paragraph 10-2. The commander decides what privileging action to take based on the facts provided. The commander is not bound by the recommendations of the credentials committee or the peer review panel. If the proposed action is to deny, suspend, restrict, reduce, or revoke the provider's privileges, the commander must advise the provider in writing of his/her hearing and appeal rights. The commander must address in the notice to the provider the specific allegations that constitute grounds for the hearing and will include relevant dates and copies of patient records that are pertinent to the hearing. [Army Reg.] 40-68, paragraph 10-6f(7)(a). All these requirements were followed in [Plaintiff's] case.

> An MTF commander will review the hearing record (including credentials committee/peer review panel findings and recommendations and any input from the provider in question) and make a decision regarding the provider's privileges. Once again, the findings and recommendations contained in the hearing record are advisory only and not binding on the commander. If he/she denies the request for reconsideration in whole or in part, the action will automatically be endorsed to The Surgeon General through the [regional medical center] Commander as an appeal. [Army Reg. 40-68, paragraph 10-9c(l)]. All these requirements were followed in [Plaintiff's] case.

*Id.*

The OSJA concluded by reiterating that the Army Surgeon General is the final appellate authority for revoking clinical privileges, while the ABCMR is authorized to correct errors or injustice in military records. AR 173. That said, the OSJA stated:

> In our view the health care providers acted in good faith and in compliance with the regulatory requirements during the processing of [Plaintiff's] QM case, and in the ultimate recommendation for revocation of privileges. Although [Plaintiff] has not specified the manner in which the alleged error or injustice in the record should be corrected, other than to request[] '. . . the Board amend his records to reflect that his clinical privileges were not revoked'[,] presumably he is seeking a reversal of TSG's decision to revoke his privileges which lead to the NPDB

report.  Based on our review, we do not see evidence of error or injustice that would warrant such an action.  The presumption of administrative regularity has not been overcome by [Plaintiff's] submission and he has the burden of proving an error or injustice by a preponderance of the evidence.  We strongly believe that no error or injustice occurred in the QM process and no correction is warranted.

[Plaintiff] has requested the [A]BCMR remove the adverse action report from the NPDB and other reporting agencies.  We respectfully note that the [A]BCMR cannot directly order the removal of information from the data bank or other reporting agencies since these are not records under the control of the Secretary of the Army.  The [A]BCMR could inform the data bank or other reporting agencies that the original notification was in error; but based on our review of the facts in this case the report approved by The Surgeon General was an accurate statement.

*Id.*

On August 8, 2017, after carefully considering all of the evidence, the ABCMR completed the record of proceedings and recommended to deny Plaintiff's relief.  AR 137-63. Plaintiff's counsel sent a letter to the Acting Secretary of the Army requesting an expedited review of the ABCMR's decision, which included Plaintiff's original application.  AR 109-36.

## VII.  DASA(RB)'S ACTION ON ABCMR'S FIRST DECISION.

On November 7, 2017, the Deputy Assistant Secretary of the Army (Review Boards) ("DASA(RB)") reviewed the findings, conclusions, and Board member recommendations, and directed that all of Plaintiff's records be sent to the Army Surgeon General's office to review and reconsider the removal of Plaintiff's clinical privileges and any associated NPDB annotations. AR 108.  On November 27, 2017, the ABCMR issued a memorandum to Plaintiff indicating that it unanimously recommended to deny his request, but that the DASA(RB) granted relief, and accordingly, it forwarded Plaintiff's record of proceedings to the Army Surgeon General's office for review and reconsideration as directed.  AR 107.

On February 21, 2018, the Army Surgeon General issued a memorandum confirming that she carefully reviewed and reconsidered Plaintiff's clinical-privileges records and corresponding

NPDB entry.  AR 82.  After a thorough examination and reassessment, the Army Surgeon

General determined that Plaintiff's privileges revocation remained valid, and the related NPDB

report was accurate.  Therefore, no further action was warranted.  *Id.*  Plaintiff's attorneys

subsequently objected to the decision to send Plaintiff's case back to the Army Surgeon General

for review and reconsideration, arguing that their interpretation of DASA(RB)'s directive was to

grant Plaintiff the relief he requested—to remove the revocation of his clinical privileges and any

associated NPDB annotations.  AR 9-10, 13-19, 49-50.

## VIII.  JUDICIAL PROCEEDINGS AND SUBSEQUENT REMAND TO ABCMR.

On April 9, 2019, Plaintiff filed a complaint with this Court, alleging Defendant violated

the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*  Plaintiff alleges the ABCMR

unlawfully withheld or unreasonably delayed implementing the decision of DASA(RB) and

challenges the underlying decision of the ABCMR and decision of the Army Surgeon General.

ECF No. 1.  On August 22, 2019, this Court granted the parties' joint motion for voluntary

remand, remanding this case to the DASA(RB) for reconsideration.  ECF No. 12.

## IX.  NEW ABCMR DECISION AND DASA(RB)'S ACTION.

On March 27, 2020, the ABCMR reviewed all supporting documents and issued a new

decision.[18]  AR 580-636.  The Board comprehensively reviewed the relevant evidence in the

record and found that the evidence presented did not demonstrate the existence of a probable

error or injustice and that the overall merits of the case were insufficient to correct Plaintiff's

---

[18]    In its decision, the Board summarized the procedural history of this case and noted its
consideration of additional information Plaintiff submitted on remand, such as letters sent from
Plaintiff's counsel directly to DASA(RB) on October 21 and 25, 2019—together with over one-
hundred thirty pages of enclosures—offering arguments restated in Plaintiff's motion for
summary judgment, as well as letters from Plaintiff's counsel to Defendant's counsel, with
additional arguments and documents to be added to the record.  AR 639-42, 644-63, 677-846.

records.  AR 631.  Accordingly, the Board voted to deny Plaintiff's application.  AR 631.  The DASA(RB) concurred with the Board's findings and recommendations.  AR 579.

## LEGAL STANDARDS

### I.  SUMMARY JUDGMENT STANDARD IN APA CASES.

Summary judgment should be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  However, "[g]enerally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions."  *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996) (citing *Marshall County Health Care Autho. v. Shalala*, 988 F.2d 1221, 1224 (D.C. Cir. 1993)).  "Like appellate courts, district courts do not duplicate agency fact-finding efforts.  Instead they address a predominately legal issue:  Did the agency 'articulate a rational connection between the facts found and the choice made?'"  *Id*. (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Syst., Inc.*, 419 U.S. 281, 285 (1974)).

"Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'"  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (quoting *Occidental Eng'r Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985)).  "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Id*. (citing *Richard v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).

## II.  APA STANDARD OF REVIEW.

"The APA requires a reviewing court to set aside an agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Escobedo v. Green*, 602 F. Supp. 2d 244, 248 (D.D.C. 2009) (quoting 5 U.S.C. § 706(2)(A)).  "An agency action may be arbitrary or capricious if the agency (1) relied on factors which Congress did not intend it to consider; (2) entirely failed to consider an important aspect of the problem; or (3) offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or agency expertise."  *Id.* (citing *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

"In making this inquiry, the reviewing court must consider whether the agency's decision was based on consideration of relevant factors and whether there was a clear error of judgment."  *Id.* (citing *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989)).  "At a minimum, the agency must have considered relevant data and articulated an explanation establishing a 'rational connection between the facts found and the choice made.'"  *Id.* (quoting *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986)).

"The arbitrary and capricious standard of the APA 'mandates that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision.'"  *Dickson v. Sec'y of Defense*, 68 F.3d 1396, 1404 (D.C. Cir. 1995) (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990)).  "This does not mean that an agency's decision must be a model of analytic precision to survive a challenge.  A reviewing court will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'"  *Id.* (quoting *Bowman Transp., Inc.*, 419 U.S. at 286).  Furthermore, "[a]s the Supreme Court has explained, 'the scope of review under the 'arbitrary

and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Escobedo*, 602 F. Supp. 2d at 248 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). Accordingly, judicial review of the Board's decision in this case "requires the district court to determine only whether the Secretary's decision making process was deficient, not whether his decision was correct." *Kries v. Sec'y of Air Force*, 866 F.2d 1508, 1511 (D.C. Cir. 1989).

## III.  INCREASED DEFERENCE FOR MILITARY DECISIONS UNDER THE APA.

In the D.C. Circuit, courts review decisions of military record correction boards "under an 'unusually deferential application of the 'arbitrary or capricious' standard' of the [APA]." *Cone v. Caldera*, 223 F.3d 789, 793 (D.C. Cir. 2000) (quoting *Kreis*, 866 F.2d at 1514); *see Piersall v. Winter*, 435 F.3d 319, 324 (D.C. Cir. 2006) (noting the deferential standard of review applied in APA cases involving military boards).  The increased deference afforded to such decisions "stems from statutory language providing that the Secretary of each service branch '*may* correct any military record . . . when the Secretary *considers it necessary* to correct an error or remove an injustice.'" *Hensley v. United States*, 292 F. Supp. 3d 399, 408 (D.D.C. 2018) (quoting 10 U.S.C. § 1552(a)(1)) (emphasis and omission in original).  "Given this language, '[p]erhaps only the most egregious decisions may be prevented.'" *Id*. (quoting *Kreis*, 866 F.2d at 1515).

"For a plaintiff to overcome the strong presumption that the military administrators discharged their duties lawfully and in good faith, he must show 'by cogent and clearly convincing evidence' that the [Board's] decision was the result of an injustice, or material legal error." *Coburn v. McHugh*, 77 F. Supp. 3d 24, 30 (D.D.C. 2014) (quoting *Epstein v. Geren*, 539 F. Supp. 2d 267, 275 (D.D.C. 2008)).  Heightened deference, accordingly, is appropriate.

<u>**ARGUMENT**</u>

**I.  DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE DECISION ARTICULATES A RATIONAL CONNECTION BETWEEN THE FACTS FOUND AND THE CHOICE MADE, IS SUPPORTED BY THE EVIDENCE IN THE ADMINISTRATIVE RECORD, AND IS IN ACCORDANCE WITH LAW.**

> **A.  The Board Explained Its Decision and Provided a Rational Connection Between the Facts Found and the Choice Made, and Its Decision Is in Accordance with Law.**

Defendant is entitled to summary judgment because the Board reasonably explained its decision to deny Plaintiff's request to reverse the Army's adverse-privileging action, providing a "rational connection between the facts found and the choice made." *James Madison Ltd. by Hecht*, 82 F.3d at 1096 (quoting *Bowman Transp., Inc.*, 419 U.S. at 285).  Plaintiff claims that the Army violated his due-process rights throughout the adverse-privileging process.  Guided by the applicable regulation and the evidence in the record, however, the Board carefully considered and addressed each of Plaintiff's allegations, concluding that each lacked merit.

> **1.  Plaintiff Was Not a Victim of Whistleblower Reprisal or Retaliation.**

Although the Board found that Plaintiff filed a grievance with the IG and a subsequent Article 138, UCMJ, complaint concerning allegations of acts of reprisal (AR 624), it determined that Plaintiff "failed to demonstrate by a preponderance of evidence that he was subject to retaliation for raising concerns." AR 626.  As the Board noted, "[t]he record indicates that neither the [Department of the Army] IG nor the [DOD] IG found the applicant to be a victim of whistleblower reprisal." *Id*. (referring to AR 636-37).  But the Board did not merely rely on the Army's and DOD's findings.  The Board examined the record and similarly found "insufficient evidence to determine, one way or another, and [fifteen] years after the fact, whether 'issues arose' between [Plaintiff] and the Camp Bondsteel Command over the adequacy of medical resource allocation and/or suicide prevention programs." *Id*.  Regardless, the Board noted "that

this question has minimal relevance to the question of whether the applicant's clinical privileges were improperly revoked." *Id.* In rejecting Plaintiff's claim, the Board provided a "rational connection between the facts found and the choice made." *James Madison Ltd. by Hecht*, 82 F.3d at 1096 (quoting *Bowman Transp., Inc.*, 419 U.S. at 285).

### 2. The Credentialing Board Followed Applicable Procedures and Afforded Plaintiff the Right to Counsel and Time to Prepare.

The Board found that Plaintiff failed to meet his burden of proving by a preponderance of the evidence "that the Credentialing Committee that convened, [fifteen] years ago, in Landstuhl, Germany to hear claims raised against him of irregularities with respect to letters of support from COL M[eyer] and S[GT] W[right] was improperly convened and composed and/or was subject to undue command influence." AR 624-25.

Specifically, the Board found that Plaintiff "was represented by counsel during the proceedings and that he had more than a week for him and his counsel to prepare. There is insufficient evidence to suggest that the composition was incorrect or that it was convened inappropriately." AR 625. The Board found "no error or injustice in this regard" and, further, "found no undue command influence." *Id.* Elaborating further, the Board stated:

> [Plaintiff] has not proven by a preponderance of evidence that the Command unfairly interfered with his efforts, [fifteen] years ago, to seek military counsel. The record indicates he was represented by counsel at key junctures of the process that ultimately led to his adverse privileging action being revoked. The circumstances of the applicant's legal representation in 2004 and 2005 were explained in [Plaintiff's] counsel's 12 January 2005 email. . . . In the email, [Plaintiff's] counsel stated that she had "spent an inordinate amount of time on [Plaintiff's] case . . . represented [Plaintiff] for a mental health evaluation, assisted him on a GOMOR, advised him on the peer review panel, reviewed a huge number of documents relating to an open case in CA [California] as well as his Article 138 complaint and IG complaint." [Plaintiff's] counsel then explains in the same email that the applicant had had a number of military attorneys assigned to him due to conflicts of interest and because [Plaintiff's] case was outside the purview of military criminal defense attorneys. These inconveniences strike the Board as the typical challenges in providing a limited number of JAG attorneys to

Soldiers and officers in need of their services.  This challenge is especially acute in wartime, such as the 2004-2005 time period.  Absent from counsel's email is any assertion that [Plaintiff's] command was improperly interfering in his efforts to seek counsel.  In this regard, the Board notes that the Trial Defense Counsel supervisory chain is entirely distinct from the command's supervisory chain. . . .

*Id.*

Likewise, the Board found that Plaintiff failed to prove by a preponderance of evidence that the credentialing committee hearing "was conducted under circumstances that did not allow him adequate time to defend the case," noting that "[n]either [Plaintiff] nor his counsel has cited any authority indicating that the time allotted for the applicant and his counsel to prepare his case was contrary to policy, regulation, or statute."  AR 626.[19]  Nor did the Board find that Plaintiff demonstrated "that applicable regulations did not authorize BG [Hawley-Bowland] to re-open the case a year after the commanding officer at Camp Bondsteel took no action to approve the Credentialing Committee's decision."  *Id*.  Equally important, the Board found "no evidence (and the applicant has produced none) indicating that BG [Hawley-Bowland] was prohibited from re-opening the case."  *Id*.

**3. No Violation of Article 13, UCMJ, Occurred.**

Similarly, the Board found that Plaintiff "failed to prove by a preponderance of evidence that he was transferred to Landstuhl, Germany and held in conditions tantamount to confinement pending a hearing, which, he alleges, hampered his ability to prepare a defense."  AR 625.  Explaining further, the Board stated:

That the applicant was held in conditions tantamount to confinement has been alleged only by one or more of the several attorneys who have advocated his case over the past [fifteen] years, and by [Plaintiff] himself.  There is insufficient corroborating evidence to support this allegation.  The proper remedy for a

[19]    *See* Army Reg. 40-68, ¶ 10-8.b.(2) (noting that the credentialing hearing "should convene within [ten] duty days (not less than [five] days but not more than [ten] days)" from the provider's receipt of the hearing notification).

"tantamount to confinement" allegation is to petition a proximate military judge
for relief.  Documents in the record indicate that [Plaintiff's] counsel raised this
issue to a military judge, but that the judge was not persuaded to take action.  The
greater weight of the evidence does not support the contention that [Plaintiff] was
held in conditions tantamount to confinement.

*Id*.

More importantly, the Board found insufficient evidence that his command unfairly interfered

with his efforts to seek military counsel, or that Plaintiff lacked the ability to prepare his defense

given the "inordinate amount of time" his counsel spent on his case.  AR 625.  Therefore, the

Board's decision was in accordance with law and may reasonably be discerned.

### 4. The Command Did Not Withhold Witnesses from the Plaintiff.

With respect to witnesses, the Board found insufficient evidence that COL Meyer and

SGT Wright failed to testify at the hearing because they were "returned to the United States after

signing their statements . . . thus limiting his ability to effectively examine them about the

circumstances underlying their statements. . . ."  AR 626.  The Board noted that Plaintiff "failed

to cite to any authority that indicates he has a procedural right, in a non-criminal, non-punitive

forum such as a credentialing hearing, to confront the witnesses against him."  *Id*.[20]  Moreover,

the Board found that Plaintiff failed to demonstrate by a preponderance of evidence that COL

Meyer and SGT Wright "were improperly being pressured by the Command to submit

inculpatory statements against [Plaintiff]."  *Id*.  With respect to COL Meyer's sworn statement,

the Board found "the tone and tenor of the statement indicate that COL M was providing his

testimony freely, voluntarily and without reservation."  *Id*.  The Board considered the relevant

data and articulated its decision.  Plaintiff merely disagrees and, contrary to established

---

[20]     *See* Army Reg. 40-68, ¶ 10-8.a.(1) (noting that the credentialing hearing is administrative
in nature, and therefore, "the rules of evidence prescribed for trials by courts-martial or for
proceedings in a court of law are not applicable").

principles of review, seeks to have the Court "substitute its judgment for that of the agency."

*Escobedo*, 602 F. Supp. 2d at 248 (internal citations omitted).

### 5. COL Meyer's New Affidavit Does Not Change the Substance of His Original Sworn Statement.

The Board specifically considered COL Meyer's October 21, 2013, affidavit. However,

the Board "did not find the affidavit to be particularly persuasive given that it was written [nine]

years after the occurrence of the relevant events of this case." AR 627. The Board also noted

that "the affidavit does not refute or recant" COL Meyer's original sworn statement. *Id*. Instead,

it "takes issue with" how COL Kesling "paraphrased COL Meyer's statement." *Id*. The Board

specifically noted:

> That the contents of the letter were placed beneath official Army letterhead is significant because [Plaintiff] was gathering recommendations during this time period to aid his search for civilian employment. The official letterhead would likely have added a measure of distinctiveness and some prestige to the letter. In his . . . 2004 sworn statement, COL M[eyer] states that . . . [Plaintiff] essentially manipulated COL M[eyer]'s letter, presumably to enhance its persuasiveness in the eyes of potential employers.

AR 628.

Further, the Board addressed Plaintiff's claim that COL Meyer's 2013 affidavit

amounted to a "substantive recanting" of his 2004 sworn statement, stating:

> Having read both COL M[eyer]'s 2004 sworn statement and his 2013 affidavit, the Board finds that the affidavit hardly, if at all, undercuts the evidentiary value of COL M[eyer]'s 2004 sworn statement. There are several reasons for this. As an initial matter, the Board notes that, in contrast to COL M[eyer]'s 2004 statement, which is several paragraphs in length, straight-forward in its tone, and fairly detailed, COL M[eyer]'s 2013 affidavit provides little detail and almost no explanation. Furthermore, COL M[eyer]'s 2013 affidavit doesn't even directly pertain to his 2004 sworn statement. Instead, it purports to rebut a single sentence in a . . . 2012 letter to [Plaintiff] from COL K[esling], Army MEDCOM Quality Management Division, regarding [Plaintiff's] case. That sentence reads, "In a sworn statement [COL Meyer] reports that you [Plaintiff] wrote a letter for him to sign, he extensively edited it and the final product was not the letter he had approved." Thus, the affidavit purports to refute the manner in which COL

31

> K[esling] paraphrased the contents of COL M[eyers]'s 2004 sworn statement. COL M[eyer]'s affidavit doesn't even claim that the offending sentence is untrue. Instead, he considers it "misleading" and explains that the 2004 recommendation letter "was written on a word processor by me with input from [Plaintiff]. The contents of the letter pertaining to [Plaintiff] were not edited or altered after I had signed it." Noticeably absent is any retraction regarding his 2004 allegation that the applicant improperly placed the contents of the letter under official Army letterhead. Nor does the carefully worded affidavit disavow that [Plaintiff] may have altered the letter without notifying COL M[eyer] and that an unsuspecting COL M[eyer] may have signed it without proofreading it. In any event, the Board finds that COL M[eyer]'s 2013 affidavit does not materially undermine the reliability and credibility of COL M[eyer]'s 20[0]4 sworn statement, a statement he made under oath fewer than [forty] days after the events in question.

*Id.*

Ultimately, the Board found COL Meyer's 2004 sworn statement "more persuasive," noting the unrefuted portions in which COL Meyer detailed the specific language that was altered by Plaintiff, particularly COL Meyer's closing statement that "I would state categorically, [Plaintiff] altered the original letter I wrote for him and that he placed it on official letterhead, an action I would never have condoned." AR 629. Moreover, the Board noted that "the allegations made by S[GT] W[right] that [Plaintiff] improperly pressured him to provide a written document remain unrefuted." *Id.* Accordingly, the Board found that [Plaintiff] failed to demonstrate by a preponderance of evidence that the Army's decision to revoke his credentials was based on unreliable or discredited evidence. *Id.*[21] The Board provided depth and detail in its analysis, paving a clear path between the facts found and the decision made. Plaintiff simply disagrees with the Boards conclusions, which is an insufficient basis for the Court to reverse the Board's decision. *See Kreis*, 866 F.2d at 1511 (noting that judicial review of a Board's decision "requires

---

[21]     The Board also found Plaintiff failed to prove that he should not have been referred to the NPDB "because his condition, conduct, or performance did not require action to protect the health and safety of patients," and that the November 7, 2017, decision of the DASA(RB) was "an unambiguous directive to the Office of the Surgeon General to review and reconsider the applicant's case relative to his credentialing." AR 627-30.

the district court to determine only whether the Secretary's decision making process was deficient, not whether his decision was correct").

**B. The Board's Finding is Supported by Substantial Evidence in the Administrative Record.**

The Court should affirm the Board's decision because there is substantial evidence to support it and the Board was not arbitrary or capricious in some other respect. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Johnson v. United States*, 628 F.2d 187, 189 (D.C. Cir. 1980) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted).

**1. Substantial Evidence Demonstrates Plaintiff was Not a Victim of Reprisal or Retaliation.**

The Board concluded that the evidence in the record did not demonstrate Plaintiff to be a victim of reprisal or retaliation. AR 626, 636-37. It conducted a thorough and impartial examination of the evidence.

The Board considered the record indicating that the IG found two whistleblower reprisal cases created in 2006 and 2008. AR 638. However, both were closed with no investigation, and both followed Plaintiff's adverse-privileging action, thereby eliminating any potential correlation based on temporal proximity. *Id.* Likewise, Plaintiff submitted an email that appears to be from an IG employee in 2004, but it was related to a matter from Plaintiff's prior assignment. AR 652. Additionally, the Board considered an IG memorandum regarding a written counseling issued to Plaintiff by LTC Roggenbach, which was later revoked by mutual agreement. AR 721. That document, however, fails to demonstrate any issues related to whistleblower reprisal or inadequacy of medical resources. Instead it appears to be related to Plaintiff's personal grievances with LTC Roggenbach being the CSCP OIC. AR 713-14, 733-34.

The Board also considered Plaintiff's letter to BG Carmony and follow-on Article 138 complaint, which fare no better. *Id.* Both reflect Plaintiff's personal grievances but fail to demonstrate the degree of outcry and retaliation Plaintiff alleges regarding purported healthcare deficiencies. Indeed, Plaintiff's main source of support for his claim of retaliation appears to be an unverified letter to an unknown recipient stating that he discovered civilian DOD personnel were eligible for medical services in combat zones, his opinion that certain facilities were not staffed well enough for the volume of patients this would produce, and his negotiated solution with another facility to share resources to cover any shortages. AR 679-81. The Board also considered this letter. AR 585. Plaintiff now claims—without any supporting evidence—that this was a letter directed to the NATO commanding general, that his immediate command was aware of it, and that it resulted in a series of retaliatory actions. ECF No. 19 at 31-32. As proof, Plaintiff cites only to his own previous arguments stating the same. Not only is the letter unsubstantiated, at best it describes a narrow issue that Plaintiff claims to have resolved.

More importantly, Plaintiff failed to demonstrate how any mutual disagreement with the command about resources or organizational structure invalidated the adverse-privileging action once it was discovered that Plaintiff altered the letters he submitted. The adverse-privileging action, including the appeals board, was conducted by unbiased medical providers outside of Plaintiff's command. As noted by the Board:

> [E]ach and every level of review to which [Plaintiff] has availed himself was not conducted by line or combat officers. Instead, each of level of review was conducted by [Plaintiff's] peers in the medical profession. In every instance, [Plaintiff's] fellow medical professionals found that [Plaintiff's] behavior had failed to meet the high standards of their medical profession.

AR 629.

Thus, as stated by the Board, the question of whether such issues arose between Plaintiff

34

and his command "has minimal relevance to the question of whether the applicant's clinical privileges were improperly revoked." AR 626.

Plaintiff attempts to revive his claim of retaliation by citing an email from COL Doreen Lounsbery, MEDCOM Deputy Chief of Quality Management, to Maureen Davis, Credentials Program Manager, arguing that it proves a retaliatory motive on behalf of the command that deprived Plaintiff of due process under the law. AR 642; ECF No. 19 at 33-35. This email was considered by the Board. AR 586 (referring to AR 642). First, COL Lounsbery's email appears to be in response to legitimate concerns regarding Plaintiff's ongoing licensing issues in several states, including California, as well as complaints from patients and providers. AR 642, 647-48. Second, both COL Lounsbery and Ms. Davis were quality-management personnel who were responsible for gathering and addressing such administrative matters. AR 74. Third, although Ms. Davis was present at the credentialing hearing, she was a non-voting member, meaning she was not a witness, did not testify, and did not provide input into the committee's deliberations. AR 647-48, 764-74. Fourth, the issue of Plaintiff's licensing was ultimately mooted by the credentialing committee in its decision—the same committee Plaintiff now claims was "tainted" by this speculative information. AR 648; ECF No. 19 at 34.

**2. The Credentialing Board Followed Applicable Procedures.**

Evidence in the record, considered by the Board, demonstrates that Plaintiff's adverse-credentialing action complied both procedurally and substantively with Army Regulation 40-68. Plaintiff has failed to prove otherwise. As confirmed by the MEDCOM OSJA in its advisory opinion to the Board, Plaintiff was notified at all stages of the process and represented by counsel at every key juncture. AR 171. All regulatory timelines were followed, and Plaintiff was afforded the opportunity to appear and be heard. *Id.* The peer review, credentialing

committee, and appeals board were all properly convened and composed of impartial members of the medical community.  AR 172.  Moreover, Plaintiff has failed to prove that the command unfairly interfered with his efforts, as discussed below.

Plaintiff's claim that he was prevented from defending himself based on his conditions in Germany and a lack of counsel is directly contradicted by the evidence considered by the Board. First, the Board noted that Plaintiff's claim that he was held in conditions tantamount to confinement "has been alleged only by one or more of the several attorneys who have advocated his case over the past [fifteen] years, and by [Plaintiff] himself.  There is insufficient corroborating evidence to support this allegation."  AR 625.

Moreover, even if Plaintiff was held in stricter conditions with military-police escorts during his mental health evaluation period in Germany from November 24, 2004, through December 17, 2004—as claimed by Plaintiff's military attorney—the evidence demonstrates that those conditions did not inhibit his ability to consult with his legal counsel or prepare for the December 14, 2004, peer review.  AR 776.  For one thing, COL Cavenar conducted his in depth investigation for the peer review prior to Plaintiff's departure to Germany, between November 19 and 21, 2004.  AR 794.  During that time, he provided Plaintiff with a "detailed list of charting problems," then later returned and allowed Plaintiff the opportunity to respond.  *Id.* Likewise, around December 7, 2004, Plaintiff was served with notice to appear at the upcoming peer-review hearing, which he later attended on December 14, 2004.  AR 790, 794-95, 798, 803. According to Plaintiff, he had time to prepare a "detailed rebuttal" before appearing at his peer-review hearing.  AR 794.  This is corroborated by Plaintiff's military counsel, who stated that she spent an "inordinate amount of time on [Plaintiff's] case," and "represented [Plaintiff] for a mental health evaluation, assisted him on a [GOMOR], advised him on the peer review panel,

reviewing a huge number of documents relating to an open case in [California] as well as his

Article 138 complaint and IG complaint."  AR 757.  As noted by the Board, "[a]bsent from

counsel's email is any assertion that [Plaintiff's] command was improperly interfering in his

efforts to seek counsel."  AR 625.

Plaintiff certainly had enough freedom and opportunity to consult with counsel and

prepare for the credentialing hearing on January 18, 2005, based on evidence considered by the

Board.  According to Plaintiff's counsel, from December 17, 2004, through January 20, 2005, all

military-police escorts were lifted, Plaintiff was provided a hotel room to live in, and he only

needed to check-in with his leadership on a daily basis.  AR 778.  On January 5, 2005, Plaintiff

was informed that a credentialing committee hearing would be held at his location in Landstuhl,

Germany.  AR 815.  Prior to the hearing, Plaintiff travelled to Schweinfurt, Germany, to consult

with his military attorney on two occasions.  AR 756.  On January 11, 2005, the legal advisor for

the Europe Regional Medical Command sent an email to Plaintiff's military attorney confirming

the hearing date and reminding Plaintiff's counsel of Plaintiff's responsibility regarding

witnesses, as well as her role in the proceedings under the Army regulation.  AR 754.

The credentialing hearing itself lasted eight hours.  AR 691.  The committee heard

testimony from Plaintiff and his two witnesses, and reviewed over fifty documents Plaintiff

provided.  AR 647.  Portions of the verbatim transcript from the hearing show that Plaintiff was

questioned extensively by the committee regarding the relevant issues, allowed to consult with

counsel, and provide responses on his own behalf.  AR 765-74.  Plaintiff was afforded the

opportunity to provide the committee "evidence that the Kosovo command bypassed due

process[,] . . . stripped him of his authority, detained him and then shipped him under guard to

Germany without stating its reasons for doing so."  AR 683.  Plaintiff also had the chance to

present to the committee his arguments about due process and the witnesses who authored the

letters in question.  AR 683.  All of this evidence considered by the Board contradicts Plaintiff's

contention that the command impaired his ability to defend his case and supports the Board's

conclusion.

Plaintiff's remaining allegations are similarly unavailing and directly contradicted by

evidence considered by the Board.  For example, Plaintiff incorrectly states that participation by

the credentialing committee's legal advisor amounts to a due-process violation that warrants

relief.  ECF No. 19 at 37.  In support of this contention, Plaintiff submitted selective portions of

the credentialing committee transcripts, which were considered by the Board.  AR 764-74.

These portions show the committee's legal advisor clarifying procedural issues raised during the

proceeding—such as whether the committee needed to decide "on the record" whether it wished

to exclude any consideration of issues related to Plaintiff's California licensure, as well as

whether Plaintiff was referring to a "draft" versus a "final" peer-review report when answering

questions from the committee.  AR 766, 769-71.  Army Regulation 40-68 expressly provides that

the committee may obtain advice concerning legal questions from the servicing legal advisor.

Army Reg. 40-68, ¶ 10-8.k.  Moreover, these two issues were procedural in nature, and

Plaintiff's attorney was allowed to respond and clarify Plaintiff's position regarding the latter.

AR 770.

Finally, Plaintiff asserts that the command impinged on his administrative rights by

allowing BG Hawley-Bowland to take action on the credentialing committee's recommendation.

ECF No. 19 at 43.  First, Plaintiff alleges that a commander's decision "lapses" if she does not

take action within fourteen days under the regulation, and that BG Hawley-Bowland failed to

take action within that time, thereby precluding her from ever doing so.  *Id.* at 16-17.  But Army

Regulation 40-68 does not say that, which the Board aptly noted when it found "no evidence (and [Plaintiff] has produced none) indicating that BG [Hawley-Bowland] was prohibited from re-opening the case." AR 626. As BG Hawley-Bowland explained, the original commander who was supposed to take action on the case, COL Steven Francis, sat as a member of the credentialing committee and was therefore conflicted from taking action on the committee's recommendation. AR 417. Even though a new commander had succeeded COL Francis, in the interest of continuity and due diligence, BG Hawley-Bowland removed it to her level upon consultation with her servicing legal advisor. *Id.* Second, Plaintiff unjustifiably suggests that BG Hawley-Bowland "injected herself" into the process out of ill will as part of a broader conspiracy against him—plainly ignoring the fact that she partially granted his request and dismissed the first issue on appeal, *contrary* to the committee's recommendation. ECF No. 19 at 17-18; AR 425.

### 3. Plaintiff's Claims of Witness Tampering Have No Merit.

Contrary to Plaintiff's contentions, the Board specifically considered the issue of COL Meyer's 2013 affidavit, as well the absence of SGT Wright and COL Meyer at the credentialing hearing. AR 626-29. As to the affidavit, the Board provided a comprehensive analysis that addressed all of Plaintiff's arguments, reaching a conclusion that is well supported by the record. *Id.* The Board compared COL Meyer's 2013 affidavit to his 2004 sworn statement and discussed all reasonable interpretations, limitations, and impacts when viewed collectively. *Id.* This included the temporal proximity between the events and the statements, the level of detail contained in each document, their context (or lack thereof), and matters that remained unrefuted. *Id.* Rather than addressing the Board's detailed rationale, Plaintiff summarily dismisses the

Board's logic as "institutional unwillingness." ECF No. 19 at 42. The Board's decision-making process was sound, however, and supported by substantial evidence.

Plaintiff asserts that COL Meyer and SGT Wright were pressured by the command to write inculpatory statements, then sent out of the country, thus limiting his ability to examine them at the credentialing hearing. ECF No. 19 at 38. This is entirely unsupported by evidence in the record considered by the Board. Additionally, Plaintiff has "failed to cite to any authority that indicates he has a procedural right, in a non-criminal, non-punitive forum such as a credentialing hearing, to confront the witnesses against him." AR 626; *see* Army Reg. 40-68, ¶ 10-8.a.(1) (noting that the hearing is administrative in nature, and therefore, "the rules of evidence prescribed for trials by courts-martial or for proceedings in a court of law are not applicable"). Moreover, the record indicates that Plaintiff and his military attorney were specifically advised—a week prior to the credentialing hearing—that it was Plaintiff's obligation to ensure any witnesses he intended to call were available for the hearing. AR 754; *see* Army Reg. 40-68, ¶¶ 10-8.b.(3)-(4). The record before the board indicates no such request by Plaintiff for COL Meyer nor SGT Wright to testify at the hearing.

In sum, the evidence considered by the Board demonstrates that the credentialing committee had the opportunity to examine the altered letters, along with the sworn statements from COL Meyer and SGT Wright. Plaintiff was provided an opportunity to give testimony, present evidence, present witnesses, consult with counsel, and answer questions from the committee during his hearing. Consequently, Plaintiff failed to meet his burden to demonstrate a violation of due process or the existence of a probable error or injustice. Because the Board's decision was based on substantial evidence, the Court should affirm its decision and grant summary judgment to Defendant.

## II.  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT FAILS.

Plaintiff's motion for summary judgment must be denied because he cannot prove, based on the record, that the ABCMR's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.  Plaintiff's arguments against the Board's decision lack sufficient factual support in the record and are unmoored from applicable legal and regulatory authorities.  He did not meet his burden to provide sufficient evidence to the Board, and he now fails to overcome his heavy burden in this Court.

Plaintiff simply disagrees with the Board's action and is now requesting that this Court substitute its judgment for that of the agency, which is contrary to the APA and controlling case law.  In fact, the ABCMR considered the relevant evidence, applied the correct legal and regulatory standards, and issued a cogent decision.  Plaintiff provides no legal basis upon which to set aside the Board's action.

## CONCLUSION

For the reasons set forth above, Defendant respectfully requests that this Court grant summary judgment in favor of Defendant.

Dated:  August 31, 2020

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney

DANIEL F. VAN HORN, D.C. Bar # 924092
Chief, Civil Division

*Of Counsel:*
NICHOLAS D. MORJAL
Major, U.S. Army
U.S. Army Legal Services Agency
9275 Gunston Road
Fort Belvoir, VA 22060

BY: */s/ Sean P. Mahard*
SEAN P. MAHARD, CT Bar # 436524
Special Assistant United States Attorney
sean.mahard@usdoj.gov
United States Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530

41

(202) 252-2574

*Attorneys for Defendant*