## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GEORGE S. LAKNER,
*Col. (Retd), MD*,

        *Plaintiff*,

    v.

JOHN E. WHITLEY,[1]
*Secretary of the Army*,

        *Defendant*.

No. 19-cv-991 (DLF)

### MEMORANDUM OPINION

Dr. George Lakner, a retired Army Colonel who specialized in psychiatry, brings this action under the Administrative Procedure Act seeking reinstatement of clinical privileges that were revoked as a result of alleged misconduct. Before the Court is Lakner's Motion for Summary Judgment, Dkt. 19, and the Secretary of the Army's Cross Motion for Summary Judgment, Dkt. 22. For the reasons that follow, the Court will deny Lakner's motion and grant the Secretary's cross motion.

## I.      BACKGROUND

### A.      Events in Kosovo

In July 2004, Dr. George Lakner, an Army reservist of nearly twenty-five years, was deployed to Kosovo to provide psychiatric medical services and serve on a mental health task force. Administrative Record (AR) 113, Dkt. 31. Unfortunately, his deployment did not go

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), John E. Whitley, in his official capacity as the current Acting Secretary of the Army, is automatically substituted in place of the former Secretary of the Army.

smoothly.  Soon after arriving, in September 2004, Lakner wrote a letter to the Brigadier General expressing concerns about the combat stress control program, especially Colonel Stanley Flemming's "reorganization" of the program to remove Lakner from what he understood to be a leadership position.  AR 713.  Lakner advised that "[t]his is not an issue of personality conflict—although there may be one."  AR 713–14.

Lakner first noted that the program was located within the hospital, rather than a separate building, which he believed increased stigma for mental health treatment.  AR 713.  Next, he complained that he was replaced by another individual, whom Lakner described as his "subordinate," as the officer in charge.  AR 713–14.  He made various other complaints that were personal in nature.  AR 713.  For example, he complained about his "ill treatment," including being "chewed out" verbally, admonished via email with others copied on the email, and ordered not to attend meetings that he had previously attended.  AR 714.  Finally, Lakner noted that Camp Bondsteel, where he was stationed, had suffered two deaths by suicide (one before Lakner he arrived and one after) and explained that one of his missions was to help address this problem.  *Id.*

Receiving no response, Lakner escalated these grievances to a complaint under Article 138 of the Uniform Code of Military Justice, AR 723–25, which provides an outlet for "[a]ny member of the armed forces who believes himself wronged by his commanding officer[.]"  10 U.S.C. § 938.  In his Article 138 complaint, Lakner claimed he was "wronged by COL Stanley Flemming" and raised similar points as in his earlier letter, in addition to new complaints, including that Flemming cancelled Lakner's cell phone service, cancelled briefings without warning, and interfered with Lakner's personal treatment schedule.  AR 723–24.  Lakner also filed a complaint with the Inspector General, believing that his negative treatment was in

retaliation for that complaint. *Id.*  In support of the Article 138 complaint, Lakner attached several letters of recommendation.  AR 724.  Two of those letters, one from Sergeant Gary Wright, a subordinate enlisted soldier, and the other from Colonel David Meyer, a medical colleague, would become the primary subject of this dispute.

**B.    Lakner's Credentialing Privileges Are Revoked**

Suspecting that Lakner may have altered the two letters of recommendation without the consent of their authors, the command initiated an investigation.  AR 394.  The investigation revealed that Lakner had in fact transferred Meyer's letter to official letterhead and altered some of its contents and that he had altered the substance of Wright's letter to include new and untrue information.  AR 394, 648, 733.

On November 8, 2004, an ad hoc meeting of the Landstuhl Regional Medical Center Credentials Committee was convened, in accordance with Army Regulation 40-68, to review "allegations of fraud, unprofessional conduct, and unethical misconduct" against Lakner. AR 371.  The committee ultimately decided to hold Lakner's credentialing privileges in abeyance for fifteen days pending further investigation.  AR 372.  Lakner received both oral and written notice that his privileges were being held in abeyance.  AR 654, 736.

Lakner asserts that members of the credentialing committee had meanwhile "waged a secret smear campaign against [him]" in the background.  Pl.'s Mot. for Summ. J. at 7, Dkt. 19. As evidence, he points to a September 15, 2004 email from Colonel Doreen Lounsbery, then-Deputy Director of the Army Medical Command's Credentialing Directorate, to Maureen Davis, a civilian who served on the credentialing committee, *see* Pl.'s Mot. for Summ. J., Ex. 28, Dkt. 19-2, in which Lounsbery discussed various issues concerning Lakner.  She wrote, for example, "[Lakner] generates lots of complaints from patients and providers, but they fail to document and

substantiate the iss[u]es.  In fact, after he speaks with them they often sign letters of recommendation for him."  *Id.*

As part of the investigation, Meyer, the author of one of the letters of recommendation, submitted a sworn statement.  AR 733.  He noted that Lakner falsely told him he wanted Meyer's letter to secure *civil* employment.  *Id.*  Meyer also stated that "[t]he first page of the letter is not the letter [he] wrote."  *Id.*  He explained that, among other discrepancies, he did not write the letter on official letterhead, did not title it as a Memorandum for Record, and "did not write that [he] was the Chief of the Medical Staff."  *Id.*  Meyer concluded that: "I would state categorically, COL Lakner altered the original letter I wrote for him and that he placed it on official letterhead paper, an action I would never have condoned."  *Id.*  Wright, the author of the other letter of recommendation, also submitted hand-written notes and a sworn statement indicating there were factual discrepancies in his letter.  AR 393–94 (stating that he had "not known COL Lakner for two decades," and "never worked for the New York City Department of Mental Health," among other things).  Wright highlighted specific portions of the letter and wrote, "[t]he information that is highlighted in this letter is not true and was not written by me."  AR 393.

On November 23, 2004, Lakner was informed he would be transferred to Landstuhl, Germany, to undergo a mental health evaluation.  AR 777.  Through the evaluation, Lakner was diagnosed with narcissistic personality disorder, AR 790, although a medical provider he hired disputed that diagnosis.  AR 790, 797.  Captain Mary Ritzmann, Lakner's military counsel, submitted an affidavit indicating that she believed Lakner was being held "in conditions tantamount to confinement" in Germany from November 24, 2004 to December 17, 2004.  AR 776.  She further believed he was being held in conditions that were "excessive" from December 17, 2004 to January 20, 2005.  *Id.*  For example, Lakner was unable to sleep because

the lights were left on at night, and he described being under "constant MP custody, and direct-sight monitoring." AR 796. Ritzmann recounted her efforts to have Lakner's restrictions lifted and explained that because Lakner's case was "administrative in nature," her efforts were unsuccessful. AR 776. Ritzmann also "objected in the most strenuous terms" to an inventory of Lakner's personal possessions conducted pursuant to Army Regulation 15-6. AR 747.

After a peer-review hearing on December 14, 2004, Lakner was given notice on January 11, 2005 that the credentialing committee hearing would be held in Landstuhl, Germany on January 18, 2005. AR 754, 759. Captain Michael Meketen, the legal advisor for the Europe Regional Medical Command, contacted Ritzmann and advised her of Lakner's rights under the applicable military regulations. AR 754. Meteken advised that although the regulations did not afford Lakner an absolute right to counsel, he could attempt to accommodate a request for Ritzmann to appear virtually or telephonically, if needed. *Id.* He also reminded Ritzmann that it was Lakner's responsibility to confirm that any witnesses he intended to call were available for the hearing, and that any failure to appear would not constitute cause for delay. *Id.* Ritzmann requested a continuance for more time to prepare for the hearing, but her request was denied. AR 759.

On January 18, 2005, the credentialing committee held a nearly seven-hour hearing to discuss Lakner's credentialing privileges. AR 647–48. The committee heard testimony from Lakner and his two witnesses and reviewed fifty-two documents that Lakner had submitted. AR 647. Wright and Meyer, the two original authors of the letters of recommendation, were not present at the hearing and did not testify. AR 831. The committee ultimately concluded that

> "[t]he sworn statements by individuals stating that COL Lakner had either re-written documents or coerced a subordinate to sign a letter of recommendation were not explained to the Committee in a satisfactory manner by COL Lakner. . . . This

behavior was found to be of grave concern and calls into question his integrity as a healthcare provider and thus is a significant concern to this organization."

AR 648.  By secret ballot, the committee members voted unanimously to revoke Lakner's credentialing privileges, *id.*, and provided Lakner notice of the decision, AR 809–10.

On August 25, 2005, Lakner submitted an extensive rebuttal to the credentialing committee's findings and recommendation.  AR 781–817.  Brigadier General Carla Hawley-Bowland, the Commander of the United States Army Europe Regional Medical Command, reviewed the committee's recommendation, evaluating the hearing record, and Lakner's post-hearing submissions.  AR 417–18.  Hawley-Boland noted at the outset that, ordinarily, the commander of Lakner's treatment facility would be the one to act on the credentialing committee's recommendation.  AR 417.  But in this case, that particular individual had sat on the credentialing committee (along with his deputy) and thus faced a conflict of interest.  *Id.* Although the commander with the conflict later left his position, Hawley-Boland concluded that "as this action has been ongoing since September of 2004, in the interest of continuity and due diligence, rather than pass the action to yet another commander, I have, in consultation with the ERMC CJA and the MEDCOM SJA, determined that I will continue to act."  *Id.*  Hawley-Boland ultimately upheld the committee's recommendation to revoke Lakner's privileges. AR 417–18.  Lakner received notice of this decision and his right to appeal.  *Id.*

## C.    The Appeals

After Lakner indicated his desire to appeal, the Army Medical Command convened an appeals board in San Antonio, Texas.  AR 424–26.  Following an independent review of the record and Lakner's rebuttal, the appeals board voted unanimously to recommend that the Surgeon General uphold the revocation, which he did on May 17, 2006.  AR 423–26. Accordingly, on May 19, 2006, the Army filed an Adverse Action Report with the National

Practitioner Data Bank, a database maintained by the Department of Health and Human Services, to indicate that Lakner's Army medical privileges had been revoked.  AR 428.

Several years later, in October 2013, Lakner's lawyers located Meyer, one of the original authors of the disputed letters of recommendation.  Pl.'s Mot. for Summ. J. at 19.  Meyer prepared an affidavit with two statements about the letter.  AR 837.  He wrote: "In your correspondence, you state the following: 'COL Meyers reports that you wrote a letter for him to sign, he extensively edited it and the final product was not the letter that he approved.'"  *Id.* "This statement . . . is misleading.  The letter was written on a word processor by me with input from Dr. Lakner.  The contents of the letter pertaining to Dr. Lakner were not edited or altered after I had signed it."  *Id.*  Meyer did not attempt to reconcile this new statement with his previous affidavit or expound further.  *Id.*

In part based on this new affidavit, Lakner appealed to the Army Board for Correction of Military Records (The Board) on November 11, 2015.  AR 111–29.  The Medical Command Office of the Staff Judge Advocate (OSJA) reviewed the underlying materials, as well as Lakner's new arguments and support, and recommended that the Board deny Lakner's requested relief.  AR 170–74.  With regard to the new Meyer affidavit, the OSJA reasoned that "[t]he affidavit does not render the revocation decision erroneous or unjust, as there is independent, still unrefuted evidence upon which the revocation decision was based."  AR 170.  The OSJA also addressed and rejected Lakner's various other arguments, including that his due process rights were violated.  AR 171–74.  The Board then conducted its own review and likewise denied Lakner's requested relief.  AR 137–63.

After that, the Deputy Assistant Secretary of the Army (Review Boards) (DASA(RB)), Francine Blackmon, reviewed the Board's decision and the underlying materials.  AR 108.

Blackmon stated: "I direct that all Department of the Army Records of the individual concerned be sent to the Office of the Surgeon General for review and reconsideration to remove the revocation of the applicant's clinical privileges and any associated National Practitioners Data Bank annotations." *Id.* The Board accordingly informed Lakner that although it had unanimously recommended denying him relief, the DASA(RB) had granted relief in the form of reconsideration by the Surgeon General. AR 107.

On February 21, 2018, the Surgeon General's Office reported that it "reviewed and reconsidered the records concerning the revocation of COL(Ret) George S. Lakner's clinical privileges and corresponding National Practitioner Data Bank (NPDB) entry." AR 82. It concluded that "[a]fter a thorough examination and reassessment [the Surgeon General] determined that the privilege revocation remains valid." *Id.*

### D.      Remand

On April 9, 2019, Lakner brought this suit against the Secretary of the Army under provisions of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701, 706(2)(A), (D). Compl. ¶¶ 17, 19–20, Dkt. 1. The parties then filed a joint motion to remand Lakner's case to the DASA(RB) for de novo reconsideration. Dkt. 10. On remand, the DASA(RB) considered, among other things, whether "(i) there is substantial evidence in the record to support each (or any) of the claims asserted in Plaintiff's Application for Relief and Correction of Army Record (November 11, 2015) and, if so (ii) whether to vacate that decision[.]" *Id.* at 2. After multiple extensions of time, the Board issued its decision, which the DASA(RB) adopted on March 27, 2020. AR 579–636. The Board reviewed the evidence, including Lakner's new submissions, and voted to deny Lakner's request. *Id.* It concluded that "[t]he evidence presented does not demonstrate the existence of a probable error or injustice. Therefore, the Board determined the

overall merits of this case are insufficient as a basis for correction of the records of the individual

concerned." AR 631.  The Board produced a 57-page opinion explaining its decision.  AR 580–

636.

After the remand, the parties filed cross-motions for summary judgment, which are now

ripe for review.

## II.    LEGAL STANDARDS

A court grants summary judgment if the moving party "shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A

"material" fact is one with potential to change the substantive outcome of the litigation.  *See*

*Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A

dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for

the nonmoving party.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.

In an APA case, summary judgment "serves as the mechanism for deciding, as a matter

of law, whether the agency action is supported by the administrative record and otherwise

consistent with the APA standard of review."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90

(D.D.C. 2006).  The Court will "hold unlawful and set aside" agency action that is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. §

706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory

right," *id.* § 706(2)(C), or "unsupported by substantial evidence," *id.* § 706(2)(E).

In an arbitrary and capricious challenge, the core question is whether the agency's

decision was "the product of reasoned decisionmaking."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*

*v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 52 (1983); *see also Nat'l Telephone Co–op. Ass'n v.*

*FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009) ("The APA's arbitrary-and-capricious standard requires that agency rules be reasonable and reasonably explained.").  The court's review is "fundamentally deferential—especially with respect to matters relating to an agency's areas of technical expertise."  *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (internal quotation marks and alteration omitted).  The court "is not to substitute its judgment for that of the agency."  *State Farm*, 463 U.S. at 43.  "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id.* (internal quotation marks omitted).  When reviewing that explanation, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Id.* (internal quotation mark omitted). For example, an agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or [the explanation] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*  The party challenging an agency's action as arbitrary and capricious bears the burden of proof.  *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015).

The arbitrary and capricious standard of § 706(2)(A) is a "catchall" that generally subsumes the "substantial evidence" standard of § 706(2)(E).  *See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 683–84 (D.C. Cir. 1984) ("When the arbitrary or capricious standard is performing that function of assuring factual support, there is no substantive difference between what it requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual

judgment supported only by evidence that is not substantial in the APA sense . . . .”); *accord Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007).

## III.   ANALYSIS

Lakner raises two sets of arguments under the APA.[2]  First, he argues that the Board acted arbitrarily and capriciously, in violation of 5 U.S.C. § 706(2)(A) by failing to meaningfully respond to several of his arguments.  Compl. ¶¶ 19–20 (Count II).  In particular, Lakner argues that the Board failed to address his rights to advance notice of the hearing, a reasonable opportunity to defend himself, and to confront witnesses against him; retaliatory animus which he believes tainted the entire proceedings; ex parte discussions about Lakner; and whether his appeal rights were hampered by the participation of General Hawley-Boland.  *See generally* Pl.'s Mot. for Summ. J.  Second, Lakner argues that the agency acted without observance of procedure, in violation of 5 U.S.C. § 706(2)(D).[3]  Compl. ¶¶ 19–20 (Count II).  Specifically,

---

[2] In his complaint, Lakner argues that the Army unlawfully withheld or unreasonably delayed implementing DASA(RB) Blackmon's decision to forward Lakner's case to the Surgeon General for reconsideration.  *See* Compl. ¶ 17 (Count I).  Lakner appears to have abandoned this argument at summary judgment.  *See generally* Pl.'s Mot. for Summ. J.  In any case, Blackmon's decision *was* implemented, as Lakner's records were forwarded to the Office of the Surgeon General, which conducted an independent review and issued a decision, in accordance with her directive.  AR 82, 108; *see* Pl.'s Mot. for Summ. J. at 20–21 (noting that Blackmon "ordered reconsideration").

[3] Lakner also raises, for the first time in his motion for summary judgment, the argument that he "possessed a protected liberty interest against the Government's unfair imposition on his right to practice his occupation of choice."  Pl.'s Mot. for Summ. J. at 28.  He goes on to say that "the APA requires setting aside agency action which violates the Constitution or some other law."  *Id.*  To the extent this argument asserts a claim under 5 U.S.C. § 706(2)(B) for agency action "contrary to constitutional right, power, privilege, or immunity," Lakner did not raise this argument in his complaint.  *See generally* Compl. (asserting only two counts, one under § 706(1), for agency action unreasonably delayed or unlawfully withheld, and the other under § 706(2)(A), (D), for arbitrary and capricious agency action and agency action without observance of procedure.  "It is well established that plaintiffs may not, through summary judgment briefs, raise new claims where such claims were not raised in the complaint and plaintiffs have not filed an amended complaint."  *Quinn v. District of Columbia*, 740 F. Supp. 2d 112, 130–31 (D.D.C.

Lakner asserts that the Army violated his right to due process under Army Regulation 40-68 (AR 40-68) through "sham" proceedings.  Pl.'s Mot. for Summ. J. at 31.

A.      **The Appropriate Standard of Review**

The parties dispute the proper standard of review in this case.  *Compare* Pl.'s Mot. for Summ. J. at 25–26, *with* Def.'s Mot. for Summ. J at 26.  When an APA challenge concerns a military record correction board, as it does here, Courts often apply an "unusually deferential application of the arbitrary or capricious standard."  *Cone v. Caldera*, 223 F.3d 789, 793 (D.C. Cir. 2000) (internal quotation marks omitted); *see Kreis v. Sec'y of Air Force (Kreis I)*, 866 F.2d 1508, 1515 (D.C. Cir. 1989) ("Perhaps only the most egregious decisions may be prevented under such a deferential standard of review."); *see also Musengo v. White*, 286 F.3d 535, 538 (D.C. Cir. 2002) (applying this heightened standard).

The "unusually deferential" standard flows from the statutory text.  *See Kreis I*, 866 F.2d at 1514.  After all, "the question whether a particular action is arbitrary or capricious must turn on the extent to which the relevant statute . . . constrains agency action."  *Id.*  And here, the governing statute states that "[t]he Secretary of a military department *may* correct any military record . . . when the Secretary *considers it necessary* to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1) (emphasis added).  In light of this wide discretion conferred by statute, "[i]t is simply more difficult to say that the Secretary has acted arbitrarily if he is authorized to act '*when he considers it necessary* to correct an error or remove an injustice.'"  *Kreis I*, 866 F.2d at 1514 (quoting 10 U.S.C. § 1552(a)) (emphasis in original).  That said, "[t]he Court's role here may be limited, but it is not that of a rubber stamp."  *Roberts v. Harvey*, 441 F. Supp. 2d

---

2010) (internal quotation marks and alterations omitted).  Accordingly, the Court does not address this new claim raised for the first time in summary judgment briefing.  *Id.*

111, 122 (D.D.C. 2006).  Even given this broad discretion, the Secretary must "give a reason that a court can measure, albeit with all due deference, against the arbitrary or capricious standard of the APA."  *Kreis I*, 866 F.2d at 1514–15 (internal quotation marks omitted).

Lakner argues that the "unusually deferential" standard often applied in military record correction board cases should not apply here.  *See* Pl.'s Consol. Reply at 3–5, Dkt. 25.  In particular, he argues that this standard is "inapposite" because "this case doesn't focus on military personnel decisions" and does not "take the court afield one iota from its competence to assess whether Col. Lakner was deprived of his rights to procedural due process and to practice his occupation without irrational government stigmatization."  *Id.* at 4.  Lakner focuses on the purpose of this heightened standard, assuring the Court that an exception in this case would not turn the courts into "a forum for appeals by every soldier dissatisfied with his or her ratings."  *Id.* at 4 (quoting *Escobedo v. Green*, 602 F. Supp. 2d 244, 248–49 (D.D.C. 2009)) (alterations omitted).  This reasoning alone is unavailing, as Lakner misconceives the basis for heightened deference.  It arises not from public policy purpose alone, but also from *statute*.  *See supra*, at 12; *Kreis I*, 866 F.2d at 1514–15.

To be sure, the D.C. Circuit has also suggested that the "unusually deferential" standard should not apply in certain cases involving military record correction boards.  *See Kreis v. Sec'y of Air Force (Kreis II)*, 406 F.3d 684, 686 (D.C. Cir. 2005).  For example, where an issue "does not involve a military judgment requiring military expertise, but rather review of the Board's application of a procedural regulation governing its case adjudication process."  *Id.*; *see, e.g.*, *Wilhelmus v. Geren*, 796 F. Supp. 2d 157, 162 (D.D.C. 2011) (applying this distinction after both parties agreed that the ordinary, non-military standard of review should apply).  In any case, the outcome here is the same, whether or not the Court applies the ordinary APA standard of review

or the unusual deference standard accorded to military personnel judgments.  Thus, the Court

need not reach to resolve this issue, as the Board's decision and proceedings survive the ordinary

standard of review.  *See Saint-Fleur v. McHugh*, 83 F. Supp. 3d 149, 155 (D.D.C. 2015)

(declining to resolve the question of whether unusual or ordinary deference applied where it did

not change the outcome of a military record correction board case).

Even the ordinary standard of review, though, requires considerable deference.  *See Kreis*

*II*, 406 F.3d at 686.  "The court need only determine whether the Secretary's decision making

*process* was deficient, not whether his decision was correct."  *Id.* (emphasis added and internal

quotation marks omitted).  In other words, the Court's role is not to determine whether the Board

made the right decision, nor whether the Court would have reached a different conclusion had it

reviewed the matter anew.  *See id.*  In the end, this Court's review is about process, not outcome.

*See id.*

## B.     Arbitrary and Capricious Agency Action

Lakner argues that the Board's decision constituted arbitrary and capricious agency

action in violation of the APA.  In particular, he asserts that the Board failed to adequately

explain its decision on several of Lakner's arguments.

The Board "considers individual applications that are properly brought before it," and

may "direct[] or recommend[] correction of military records to remove an error or injustice."  32

C.F.R. § 581.3(c)(2)(i).  Claims before the Board are subject to a "presumption of administrative

regularity" and the individual requesting relief has the "burden of proving an error or injustice by

a preponderance of the evidence."  *Id.* § 581.3(e)(2); *Cone*, 223 F.3d at 792–93.

To survive arbitrary and capricious review, an agency must consider the relevant data and

explain its decision with a "rational connection between the facts found and the choice

made." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986); *see also Pub. Citizen, Inc. v. Fed. Aviation Admin.*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result."). "[T]he scope of review under the arbitrary and capricious standard is *narrow* and a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43 (emphasis added, internal quotation marks omitted).

Lakner argues that the Board failed to adequately explain its decision-making as to several of his arguments on remand.  The Court will address each in turn.

### 1.   *The Credentialing Committee Hearing*

Lakner argues that the Board failed to address various issues he raised about the initial credentialing committee hearing held in Germany in 2005.  *See generally* Pl.'s Mot. for Summ. J. The Board did, however, consider and explain the propriety of the committee and its hearing. *See* AR 624–25.  For example, the Board incorporated into the factual background of its findings that Lakner "calls into question the legitimacy of the committee's decision on several counts because the applicant and his appointed defense counsel were not allowed to call witnesses, cross-examine the government witnesses nor question the legitimacy of the claims against him." AR 588.  It also considered that "[Lakner] was allowed representation by a third[4] appointed defense counsel and was not allowed to cross-examine witnesses nor was he provided with documents such as investigators notes, summaries or reports into his alleged unprofessional misconduct."  *Id.*

---

[4] Lakner complained that he had been assigned three different attorneys in the course of the proceedings.  AR 588.  The Board acknowledged that "[Lakner] had had a number of military attorneys assigned to him due to conflicts of interest and because the applicant's case was outside the purview of military criminal defense attorneys."  AR 625.

In response to Lakner's argument that he had difficulty securing counsel and was assigned three different military attorneys, the Board noted that Lakner "was represented by counsel at key junctures of the process that ultimately led to his adverse privileging action being revoked," AR 625, and explained that "[t]hese inconveniences strike the Board as the typical challenges in providing a limited number of JAG attorneys to Soldiers and officers in need of their services.  This challenge is especially acute in wartime, such as the 2004-2005 time period." *Id.*

As for Lakner's complaints about notice, the Board found "that the applicant has failed to prove by a preponderance of evidence that the Credentialing Committee hearing was conducted under circumstances that did not allow him adequate time to defend the case."  AR 626.  It reasoned that Lakner was represented by counsel, was given over a week to prepare, and that "[n]either the applicant nor his counsel has cited any authority indicating that the time allotted for the applicant and his counsel to prepare his case was contrary to policy, regulation, or statute."  *Id.*

Finally, as to Lakner's arguments about the original authors of the letters not being present at the hearing and his inability to cross-examine them, the Board found that it lacked sufficient evidence to determine whether Meyer and Wright "were returned to the United States after signing their statements that were presented against the applicant, thus limiting his ability to effectively examine them about the circumstances underlying their statements that were submitted against him."  *Id.*  It recognized that, regardless, Lakner "has failed to cite to any authority that indicates he has a procedural right, in a non-criminal, non-punitive forum such as a credentialing hearing, to confront the witnesses against him."  *Id.*  Indeed, Lakner was made

aware that it would be his responsibility to assure the presence of any witnesses at his hearing. AR 754.

In sum, the Board properly considered and explained its decision that Lakner had failed to meet his burden to show that the 2005 credentialing committee was procedurally improper.

2. *Retaliatory Animus*

Lakner claims that the Board failed to consider his argument that he was retaliated against for raising concerns about mental health treatment in the Army. *See* Pl.'s Mot. for Summ. J. at 31. The Board did consider and address Lakner's contention, however. It included in the factual background of its findings that Lakner "submitted requests for redress to his local task force hospital commander and an Article 138, UCMJ request for an investigation to the CG, 21st Theater Support Command." AR 587. It also considered and incorporated Lakner's view that "his intent was to identify health care delivery deficits in Kosovo to superiors and for his actions he faced the potential loss of his provider credentialing privileges." *Id.*

The Board further explained that, although "there is evidence to support applicant's claims that he filed with the Inspector General a grievance and a subsequent Article 138 complaint alleging acts of reprisal by the Camp Bondsteel Command, where in 2004 he was serving in Kosovo," AR 624, Lakner "has failed to demonstrate by a preponderance of evidence that he was subject to retaliation for raising concerns, including a grievance and a subsequent Article 13[8] complaint to the Inspector General." AR 626. In support of this conclusion, the Board noted that "[t]he record indicates that neither the [Department of the Army Inspector General] nor the [Department of Defense Inspector General] found the applicant to be a victim of whistleblower reprisal." *Id.* The Board also independently concluded, after its own review of the record apart from the contemporaneous Inspector General findings, that there was

17

"insufficient evidence to determine, one way or another, and 15 years after the fact, whether issues arose between [Lakner] and the Camp Bondsteel Command over the adequacy of medical resource allocation and/or suicide prevention programs." *Id.*

Lakner questions the Board's conclusion "in light of the temporal proximity between the IG Office's instructing Col. Flemming in Kosovo to rescind false documents he'd written about Col. Lakner and the adverse events that followed." Pl.'s Mot. for Summ. J. at 32. While Lakner is free to disagree with the Board's finding, that alone is insufficient to render the Board's judgment arbitrary and capricious. The Board addressed Lakner's argument and provided a basis for its decision that was rationally connected to the facts.

### 3.   *Ex Parte Discussions*

The Board likewise considered Lakner's evidence that ex parte discussions between a member of command and a member of the credentialing committee "tainted" the hearing. *See* Pl.'s Mot. for Summ. J. at 7, 33–34. The Board considered as part of the record the email from Colonel Lounsbery to Maureen Davis, which noted various problems with Lakner's performance and relationships, including that "[h]e generates lots of complaints from patients and providers, but they fail to document and substantiate the issues. In fact, after he speaks with them they often sign letters of recommendation for him." AR 586; Pl.'s Mot. for Summ. J., Ex. 28 (unredacted email). The Board also incorporated into its factual findings Lakner's argument that a "subordinate officer of the Europe MEDCOM Commanding General's staff, who also served as the Deputy Director of the Credentialing Directorate, was soliciting individuals to report on the applicant's duty performance with the objective of removing the applicant's credentialing privileges to practice medicine in the U.S. Army." AR 587. And that "[i]t is from [Lounsbery's] email that counsel construes the applicant has sufficient evidence to support his theory." *Id.*

Faced only with this evidence to support Lakner's theory, the Board concluded that Lakner "has not carried his burden of proving by a preponderance of evidence that the Credentialing Committee that convened, 15 years ago, in Landstuhl, Germany to hear claims raised against him . . . was subject to undue command influence." AR 624–25. Although the Board's reasoning on this point is not a "model of analytical clarity," *see Frizelle v. Slater*, 111 F.3d 172, 176 (D.C. Cir. 1997), "the agency's path may reasonably be discerned," *id.*, and the Board explicitly considered Lakner's arguments to the contrary. AR 624–25. For these reasons, Lakner has not shown that the Board erred.

4.     *Conditions in Germany*

The Board considered and rejected Lakner's argument that the conditions in which he was held in Germany while undergoing a mental health evaluation and awaiting the credentialing committee hearing were "tantamount to confinement." AR 625. The Board reasoned that this allegation has been brought "by one or more of the several attorneys who have advocated his case over the past 15 years, and by the applicant himself." *Id.* And found that "[t]here is insufficient corroborating evidence to support this allegation." *Id.* What is more, "[t]he proper remedy for a 'tantamount to confinement' allegation is to petition a proximate military judge for relief," *id.*, and "[d]ocuments in the record indicate that the applicant's counsel raised this issue to a military judge, but that the judge was not persuaded to take action." *Id.*

5.     *"Liberty Interest"*

Lakner argues that "[a] trenchant example of the Board's fleeing from its duty to respond to the claims before it may be seen from its avoidance of Col. Lakner's liberty interest argument," which focuses on Lakner's liberty to pursue his chosen profession. Pl.'s Mot. for Summ. J. at 29 & n.104. It is true that the Board acknowledged that Lakner referenced "liberty

interest" case law in a letter to the DASA(RB), but it did not separately address the purported

"liberty interest" argument in its findings. *See* AR 590–91.

The Board's choice not to separately address this argument does not render its decision

arbitrary and capricious. "It is well established that a military review board acts arbitrarily in

failing to respond to arguments raised by a plaintiff, which do not appear frivolous on their face

*and could affect the Board's ultimate disposition*." *Rudo v. Geren*, 818 F. Supp. 2d 17, 25

(D.D.C. 2011) (emphasis added and internal quotation marks omitted). Here, Lakner's

argument, even if considered, would have had no effect on the Board's ultimate disposition. For

this reason, the Board did not act arbitrarily in declining to separately address it. *See, e.g.*, *Saint-*

*Fleur*, 83 F. Supp. 3d at 156 (rejecting an arbitrary and capricious challenge where the plaintiff

argued that the Army Board for Correction of Military Records did not consider "the useful

framework of the Civil Rights Act," because Courts in this jurisdiction and every Court of

Appeals to address the issue had determined that the military need not abide by the Title VII

framework).

"The government violates an individual's constitutional due-process rights if it deprives

her of a liberty or property interest *without providing sufficient procedural protections*. . . . One

of the liberty interests protected by the Fifth Amendment is the right to 'follow a chosen

profession free from unreasonable governmental interference.'" *Campbell v. District of*

*Columbia*, 894 F.3d 281, 288 (D.C. Cir. 2018) (emphasis added); AR 591 (citing *Campbell*, 894

F.3d at 288). In other words, the "liberty interest" involved in the right to practice one's

profession that Lakner cites is not a freestanding right—it is tethered to procedure. *See*

*Campbell*, 894 F.3d at 288. And as discussed throughout this Memorandum Opinion, the Board

focused at length on whether the Army provided sufficient "procedural protections" to Lakner,

*id.*; *see* AR 624–30, and reached the conclusion that it had.  For this reason, the Board had no reason to reach the issue of whether, had the Army *not* provided sufficient procedural protections, Lakner would have been deprived of any right to pursue his chosen profession.

    6.     *Meyer's 2013 Affidavit*

Lakner argues that "[t]he Board also failed to discuss the consequences of Col. Meyer's sworn declaration presented to the Surgeon General."  Pl.'s Mot. for Summ. J. at 41.  This contention, once again, simply cannot be squared with the administrative record.  The Board made clear that it "specifically considered COL M[eyer]'s 21 October 2013 affidavit."  AR 627. But it "did not find the affidavit to be particularly persuasive given that it was written 9 years after the occurrence of the relevant events of this case" and "does not refute or recant COL M[eyer]'s original sworn statement."  *Id.*

    7.     *Hawley-Boland's Review*

Finally, the Board also considered and explained its reasoning with regard to Lakner's argument that his appeal rights were "truncated" because Brigadier General Hawley-Boland considered his appeal when the commanding officer of his medical unit had a conflict of interest and then left his position.  Pl.'s Mot. for Summ. J. at 43–44.  The Board first noted the relevant facts: "[Lakner] received information to appeal the committee's recommendation to the brigadier general who conducted the initial fact-finding in Kosovo.  The brigadier general was a theater official who was several levels removed from the scene."  AR 589.  And it summarized Lakner's objections, noting that "[c]ounsel questions the brigadier general's involvement because it was the decision of the Kosovo Medical Task Force commander not leaders in Landstuhl," and as a result, "it made no sense for a theater [medical] commander to make a decision that should have been made at the scene or by a regional commander."  *Id.*

The Board went on to explain that Lakner "has not demonstrated by a preponderance of evidence that applicable regulations did not authorize [Hawley-Boland] to re-open the case a year after the commanding officer at Camp Bondsteel took no action to approve the Credentialing Committee's decision." AR 626. And, on its own review, "the Board found no evidence (and the applicant has produced none) indicating that [Hawley-Boland] was prohibited from re-opening the case." *Id.*

The Board also outlined the many levels of review Lakner was afforded *beyond* Hawley-Boland's interim review:

> The Board notes that [Hawley-Boland] revoked the applicant's clinical privileges and then denied his reconsideration request. [Hawley-Boland's] decision was considered by the Army Surgeon General on appeal. The case went before the U.S. Army Medical Command Medical Appeals Board. The Medical Appeals Board recommended that the Army Surgeon General uphold the revocation. The Army Surgeon General affirmed the revocation of the applicant's clinical privileges. In 2017, the Deputy Assistant Secretary of the Army (Review Boards) afforded the applicant extraordinary and additional due process by sending the applicant's case back to the Army Office of the Surgeon General for review and reconsideration. After review and reconsideration, the Army Surgeon General decided that revoking the applicant's credentials remained the right thing to do. To the best of this Board's knowledge, each and every level of review to which the applicant has availed himself was not conducted by line or combat officers. Instead, each of level of review was conducted by the applicant's peers in the medical profession. In every instance, the applicant's fellow medical professionals found that the applicant's behavior had failed to meet the high standards of their medical profession.

 AR 629.

Overall, "an agency's decision need not be a model of analytic precision to survive a challenge. A reviewing court will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Frizelle,* 111 F.3d at 176 (internal quotation marks and alterations omitted). Here, the Board explained the relevant evidence it considered and justified

its decision based on that evidence.  Lakner has not met his burden to show that the Board acted arbitrarily and capriciously in considering his requests for relief.

### C.      Agency Action Without Observance of Procedure

Lakner argues that the Army denied him due process, in violation of Army Regulation 40-68.  Pl.'s Mot. for Summ. J. at 31.  He asserts that "[t]he due process afforded here to Col. Lakner, both initially and on remand, proved a sham."  *Id.*  The Court disagrees.

Army Regulation 40-68 establishes that "[a]dverse privileging" "has four steps: investigation, professional peer review, hearing, and appeal."  Army Reg. 40-68 ¶ 10-1.  A formal credentialing committee hearing is permitted, but not required.  *Id.* ¶ 10-7.  The regulation also makes clear that "[t]he hearing is *administrative* in nature. Therefore, the rules of evidence prescribed for trials by courts-martial or for proceedings in a court of law are not applicable."  *Id.* ¶ 10-8(a)(1) (emphasis added).  Thus, Lakner's arguments about his right to confront and cross-examine the witnesses against him is of no moment.

Further, "[t]he committee *may* question witnesses and examine documents, as necessary, to collect pertinent information," but is not required to question any particular witnesses.  *Id.* ¶ 10-8(a)(2).  The regulation also makes clear that "[t]he provider should be advised that he/she is responsible for arranging the presence of his/her witnesses and that failure of such witnesses to appear will not constitute a procedural error or basis for delay of the proceedings."  *Id.* ¶ 10-8(b)(4).  Lakner's argument that conducting the hearing without "the prosecution's star 'witnesses,'" Pl.'s Mot. for Summ. J. at 38, cannot be squared with the clear dictates of the regulation.

As to timing and notice, the regulation states that: "[t]he hearing should convene within 10 duty days (not less than 5 days but not more than 10 days) from the provider's receipt of the

hearing notification unless extended for good cause by the hearing board chairperson."  Army

Reg. 40-68 ¶ 10-8(b)(2).  As a general matter, "[t]he time lines are established to allow the

individual in question adequate time to prepare for and sufficiently participate in the proceedings

and to facilitate timely resolution of the adverse privileging/practice action."  *Id.* ¶ 10-5(d).

"While it is important that the time limits reflected in this regulation are met, no rights will

accrue to the benefit of an affected provider/professional, in an otherwise proper action, based

solely on the organization's failure to meet such time limits."  *Id.*  Accordingly, Lakner's

arguments that the Army violated his rights under the regulation by failing to provide him

additional time and by not meeting its internal timelines cannot prevail.

On the right to counsel, the regulation states that: "[l]egal representation in this matter is

not an entitlement but may be provided subject to resource limitations as determined by the

supervisory judge advocate in the office of the SJA or Trial Defense Service."  *Id.* ¶ 10-8(b)(5).

The regulation also establishes the scope of the legal representation: "[s]uch representatives may

attend the hearing but their participation is limited to advising the provider only. They will not be

permitted to ask questions, respond to questions on behalf of the provider, call or question

witnesses, or seek to or enter material into the record."  *Id.* ¶ 10-8(c).  On this basis, Lakner's

argument about his counsel's lack of participation during the hearing also fails.

In sum, Lakner has not shown that the Army failed to act in accordance with agency

procedures.

## CONCLUSION

The Court's role in this dispute, which has spanned seventeen years and multiple rounds

of review by multiple bodies, is limited.  The Court is not tasked with deciding whether the

Army should have revoked Lakner's medical privileges, but rather, whether the Board

24

adequately explained its decision and whether the Army provided Lakner due process. Respectful of the appropriate deference owed, the Court will not substitute its judgment for the Board's.  The record reflects that the Board considered Lakner's arguments, adequately explained its reasoning, and provided a factual basis for its findings.  The Army also acted in accordance with its procedures.  Accordingly, Lakner's motion for summary judgment is denied and the Secretary's cross motion for summary judgment is granted.  A separate order consistent with this decision accompanies the memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

March 25, 2021